EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.*
MERCEDES SÁNCHEZ PARRA, acusada y apelante.

Núm. 7013.—*Sometido:* Mayo 18, 1939. *Resuelto:* Julio 19, 1939.

*Arturo Aponte, Angel M. Villamil* y *Benjamín Ortiz,* abogados de
la apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

E<small>L</small> J<small>UEZ</small> A<small>SOCIADO</small> S<small>EÑOR</small> D<small>E</small> J<small>ESÚS</small> emitió la opinión del tribunal.

Mercedes Sánchez Parra fué acusada de un delito de asesinato. Al llamarse la vista del caso y antes de que se procediera a constituir el jurado, el fiscal redujo la calificación del delito a asesinato en segundo grado. El jurado la declaró culpable de homicidio voluntario. Solicitó nuevo juicio y le fué denegado. Dictóse sentencia condenándola a seis años de presidio con trabajos forzados. De la resolución denegatoria del nuevo juicio y de la sentencia apeló para ante este tribunal.

En su alegato imputa a la corte sentenciadora la comisión de seis errores, a saber:

"1. La Corte de Distrito erró al permitir que cierta persona declarase sobre la llamada prueba de la parafina, contra la objeción y excepción de la acusada.

"2. La Corte de Distrito erró al permitir que un experto declarase que la mano del muerto no estuvo en contacto con arma alguna.

"3. La Corte de Distrito de San Juan erró al no anular el veredicto del jurado por el fundamento de ser contrario a derecho y a la prueba, y negarse, por ese motivo, a conceder un nuevo juicio a la acusada.

"4. La Corte de Distrito de San Juan erró al ignorar la teoría del suicidio en sus instrucciones al jurado y al hacer caso omiso de las manifestaciones exculpatorias contenidas en la declaración escrita de la acusada que fué presentada como prueba por el fiscal.

"5. La Corte de Distrito de San Juan erró al dar instrucciones de homicidio en este caso y al prescindir de los distintos grados o modalidades del mismo, habiendo servido el error ante el jurado como 'compromise' o medio para condenar a la acusada en alguna forma.

"6. La Corte de Distrito de San Juan erró al negarse a trasmitir al jurado la instrucción segunda solicitada por la defensa."

Los errores señalados por la apelante están tan íntimamente relacionados con la prueba que para la mejor inteligencia de la discusión que habremos de hacer de cada uno de

ellos, empezaremos con la relación de la evidencia que sirvió de base a las instrucciones de la corte y al veredicto del jurado.

En las primeras horas de la mañana del día 22 de diciembre de 1935 apareció el cadáver de Salvador Planadeball en la playa del Condado, en Santurce. Parecía estar recostado de una roca, con una pierna contraída y la otra extendida, como si estuviese sentado, y la cabeza ligeramente inclinada hacia la derecha. Presentaba una herida de bala en la región parietal derecha y una erosión en una mano. El sombrero estaba en el suelo, boca abajo, y no apareció arma alguna ni casquillo de bala en sus alrededores. Vestía de blanco y tanto sus ropas como el sombrero estaban húmedos con motivo de la lluvia que cayera en la madrugada y en la mañana de ese día. La herida de bala no presentaba tatuaje ni evidencia alguna de haber estado en contacto con el humo de la pólvora. El sombrero, sin embargo, mostraba el fogonazo, y partículas de pólvora, que examinadas después demostraron ser de la denominada pólvora negra, que según los peritos es la que corrientemente se usa. Ante la posibilidad de un suicidio, el cadáver fué trasladado a una clínica y sus manos fueron sometidas a la prueba de la parafina por Eleuterio Hernández, uno de los expertos del Negociado de Investigaciones Criminales. La prueba de la parafina resultó negativa en ambas manos, lo que indicaba la ausencia de nitratos en las manos del interfecto y consiguientemente la posibilidad de que el arma que causó la muerte hubiese sido disparada por otra persona, disminuyendo así las posibilidades de un suicidio.

De la prueba resulta que el día 21 de diciembre de 1935 el interfecto y la acusada estuvieron de visita, como a las diez de la mañana, en la casa de Marcia Corretger, amiga de la acusada, quien residía en la calle Delicias, en Santurce. Ese día celebraban en la casa el cumpleaños de Carmen Baldorioty, hija de Marcia, y los invitaron a almorzar.

Aceptaron, y se marcharon para volver a la hora del almuerzo. Como a las doce del día llegó él y poco después ella. Estaban disgustados y aunque se sentaron a la mesa, no almorzaron. La acusada le echaba cenizas de cigarrillo en el plato del interfecto. Estaba muy molesta porque en la mañana de aquel mismo día lo encontró hablando con una señora en el "Wonder Bar" y no vino inmediatamente donde ella. Él le decía que se dejara de tonterías, que aquélla era la esposa de un amigo suyo que visitaba su casa y ella le contestaba que ella, la acusada, "era primero que nadie." También fué motivo de disgusto el hecho de que la acusada insistía en que el interfecto se divorciara para entonces irse juntos a vivir a los Estados Unidos, luego que ella también se divorciara, y el interfecto le contestaba que él no estaba dispuesto a divorciarse porque su mujer era buena, no le había dado motivos de divorcio y él no quería abandonarla con sus hijos. La acusada regresó luego a San Juan y frente al edificio Bouret se encontró con Carmen Baldorioty y Modesta Rivas, esta última *nurse*, que también vivía en la casa de Marcia Corretger. Las invitó que la acompañaran a la oficina del interfecto en el edificio Bouret, donde decía que tenía que recoger una carta. Subieron las tres a la oficina. El interfecto no estaba allí. La acusada fué hasta el escritorio de éste y tomó un pedazo de papel que luego fué ofrecido en evidencia y escribió: "Planas, te quiero. Si eres mío o no, dímelo. Siempre tuyo hasta el capullo", y al dorso escribió: "Siempre tuyo hasta el capullo." Este papel lo fijó en la pared con un alfiler, hecho lo cual derramó el tintero sobre el escritorio, desconectó el teléfono, cogió un *portfolio* de cuero conteniendo documentos. y salió con sus amigas. Fueron hasta "El Aquarium" y de allí salieron en automóvil para la casa de Marcia Corretger, llegando como a las seis de la tarde. Encontraron a Planadeball dormido en la cama de Marcia, y la acusada lo hizo levantar diciéndole que ella se marchaba

para Ponce. Permanecieron, sin embargo, un rato en la casa, y ya oscureciendo, a invitación de la acusada, ésta y el interfecto salieron a pie con dirección al Condado. Tres testigos que se hallaban en los alrededores del edificio del *club* de los "Afda", entonces en construcción, declararon que vieron pasar, con dirección a la playa del Condado, una mujer y un hombre. La mujer caminaba rápidamente y el hombre la seguía como a un metro de separación. Que al llegar a cierto sitio, la mujer corrió y el hombre continuó detrás de ella. Algunos de estos testigos declararon que pudieron observar que ella iba vestida de oscuro y él de un color claro, no pudiendo distinguir sus rostros porque estaba ya bastante oscuro. Que una y otro se perdieron en la oscuridad de la playa. Uno de los testigos, después de desaparecer ellos en la oscuridad observó como la luz de un cigarrillo que se extinguió algún tiempo después. Más tarde oyeron todos una detonación, pero no sospecharon que se tratase de un disparo de arma, porque en aquellos días, próximas las Navidades, acostumbraban los niños quemar petardos y creyeron que se trataba de uno de éstos. Una testigo, ama de llaves del Sr. Adrián Pérez, que vivía en la calle Nereidas frente a un solar desocupado que se extiende hasta el mar, se hallaba acostando los niños cuando oyó la detonación. Salió al balcón y vió una mujer que venía corriendo sola de la playa. La siguió observando y al llegar la mujer a la esquina de las calles Condado y Nereidas, frente a la casa del Sr. Domenech, la luz del foco le permitió ver que la mujer vestía un traje azul marino, llevaba una cartera y el sombrero tenía una cinta negra.

Declaró Marcia Corretger que aquella misma noche del 21 de diciembre llegó la acusada a su casa diciéndole que Planadeball se había matado. Que la acusada tenía su maleta en la casa de la testigo y que se cambió el traje que llevaba, color azul marino, y se lo entregó diciéndole: "Ahí te dejo eso, pícalo, quémalo o haz lo que quieras." Declaró

también la testigo Modesta Rivas que a esa hora estaba arreglando su cama para acostarse, y al oír gente en la casa, bajó y se encontró que era la acusada, teniendo lugar entre ellas el siguiente diálogo:

"Muchacha, ¡tú estás aquí! Ya yo te hacía lejos de aquí."

"Muchacha, cállete, que Planas se ha matado. Cuando vengan a preguntar aquí digan que no saben nada, que no me han visto." (T. de E., pág. 229.)

La misma testigo le preguntó cómo se había matado Planadeball, pues lo había visto por la tarde y no tenía armas, y que la acusada le contestó:

"Yo tenía el revólver de él y él por la tarde empezó a decirme que le prestara el revólver, y últimamente me dijo: 'Préstame el revólver.'"

Que ella no había querido prestárselo, pero que tanto él la había molestado que se lo había dado y se lo echó en el bolsillo, y entonces dijo: "Fíjate lo que has hecho." Declaró además esta testigo que la acusada cogió el revólver en la mano y lo echó dentro de la cartera. Lo tenía en el suelo y cuando estaban en la conversación ella lo cogió y entonces lo echó dentro de la cartera, pero antes lo limpió con la mano. Que la única persona que estaba en la habitación en aquel momento era Marcia Corretger, quien se hallaba acostada. Declaró también esta testigo que al decirle la acusada que Planadeball se había matado, le dijo que por qué no llamaba al hospital, porque quizás estuviera con vida, y le contestó la acusada que él estaba muerto, que lo sabía porque lo había tocado, y le dijo: "Déjalo, no vayas tú a meter la pata, tú no llames a ningún sitio." En esos momentos llegó a la casa un automóvil donde venía un amigo de la testigo. Ésta le ofreció a la acusada si quería que ella y su amigo la llevasen a la casa donde ésta estaba hospedada y la acusada le contestó que no, que como la testigo iba a salir, cuando pasara por la parada 15 le hablase un automóvil para que viniera a buscarla. De la casa de Marcia Corretger la

acusada fué aquella noche a la de la Sra. Amelia Bithorn, en el Condado. Durmió allí y por la noche pidió al esposo de la Sra. Bithorn que le consiguiera un automóvil para trasladarse a Ponce, saliendo a las siete del 22 de diciembre para dicha ciudad.

La declaración del Jefe de la Detective, Sr. Lloréns, es de gran importancia en el esclarecimiento de los hechos. Describe en primer término la posición en que encontró el cadáver cuando a las 7:30 de la mañana fué avisado por teléfono. Lo registró y asegura que no tenía armas. Explica luego las distintas gestiones que practicó, especialmente en la oficina del interfecto, corroborando la declaración de Modesta Rivas y Carmen Baldorioty sobre el estado de desorden en que la acusada dejó el escritorio. Declara que encontró allí una caja de cartas dirigidas al interfecto firmadas "Merce", y lo que es más importante, nos describe la entrevista que tuvo el lunes 23 con la acusada en la oficina del Sr. Gotay primero y en la de la Comisión de la Policía Insular después. A este respecto declaró el Sr. Lloréns que respondiendo a una llamada telefónica fué a la oficina del Sr. Gotay, del periódico J'Accuse, encontrándose allí con la acusada. Le manifestó ella que estaba dispuesta a ir donde él quisiera. En presencia de la acusada le manifestó el Sr. Gotay que ella había venido de Ponce para entregarse, porque tenía conocimiento de que la estaban buscando y quería evitar que la arrestaran en Ponce y perjudicar la reputación de su familia. Con respecto al interfecto le manifestó la acusada que había tenido un disgusto con él en San Juan que continuó en la casa de Marcia Corretger, y que la noche del 21 había salido de paseo con él a la playa. Allí volvieron a tener otro disgusto con motivo de que ella quería que él se divorciase por un viaje que proyectaba ella a los Estados Unidos. Que él no accedió y disgustada ella se puso de pie, diciéndole que habían terminado sus relaciones. Que al dar ella unos pasos se oyó

la detonación y volvió donde él creyendo que lo había hecho para que ella no se fuera. Que inspeccionó el cadáver y observó que sangraba "por la parte derecha", y *al darse cuenta de que estaba muerto buscó el revólver por todas partes y no lo encontró.* Que ella tenía interés en encontrarlo para suicidarse, y no hallándolo, regresó a la casa de Marcia Corretger a recoger algo que tenía allí, pasando después a la casa del Sr. Mejías, esposo de la testigo Amelia Bithorn, cerca del Presbiteriano, donde durmió. Que por la mañana temprano salió para Ponce y visitó a su tío, que es abogado, en la Clínica del Dr. Pila. Que al informarle lo que le había ocurrido su tío le dijo que esperara que de un momento a otro fueran a arrestarla y esto determinó su viaje a San Juan.

Presentó el fiscal en evidencia la declaración que ante él prestó la acusada la noche del 23 de diciembre de 1935. Después de advertida por el fiscal de su derecho de abstenerse de declarar y que en caso de declarar su testimonio podría usarse en contra suya, y luego de asegurar la acusada que su declaración era espontánea, que nada se le había ofrecido ni ninguna amenaza se le había hecho, procedió a describir lo sucedido en la playa en la siguiente forma:

"F. Pues entonces tenga la bondad de explicar lo que usted desee.

"A. Nosotros teníamos compromiso de ir a La Mallorquina a cenar . . .

"F. ¿Usted y Planas?

"A. Sí, señor.

"F. Siga.

"A. Y después pensábamos ir al Escambrón un rato y a él se le hizo tarde...

"F. ¿Se le hizo tarde a él?

"A. Sí, señor.

"F. ¿Qué hicieron entonces?

"A. Nos fuimos a pasear por el Condado.

"F. ¿Hasta dónde llegaron?

"A. Apreciarlo no lo sé. Sé que dimos unas cuantas vueltas a pie.

"F. Siga.

"A. Entonces él me indicó que fuéramos a la playa y allá fuimos y yo me senté y él se quedó parado; entonces estuvimos hablando de ciertas cosas allí . . .

"F. De qué hablaron?

"A. De un viaje, que yo pensaba ir en enero a Nueva York.

"F. ¿Usted tenía el viaje ése sola o con él?

"A. Sola, con el propósito de ir a coger uno o dos meses de invierno.

"F. Siga.

"A. Entonces él me preguntó que cuándo yo me iba y yo le dije: 'En la primera semana de enero', y me dijo que sola no podría dejarme ir, que nosotros teníamos que resolver nuestra situación.

"F. ¿Qué situación?

"A. La situación nuestra.

"F. ¿Cuál era la situación?

"A. La situación de ser nosotros dos casados.

"F. Siga.

"A. Hablamos y él me dijo: 'Tu determinación es ésa;' yo le dije: 'Sí, me voy en la primera semana de enero.' Porque él quería irse a fines de enero, porque él tenía que arreglar unos asuntos antes, porque él quería que no volviéramos más acá, por lo pronto.

"F. ¿De irse a vivir juntos los dos?

"A. Sí, señor.

"F. ¿Qué más?

"A. Yo me levanté y le dije que me iba, y él me dijo: '¿Te vas?' y yo le dije: 'Sí', y caminé dos o tres pasos. . .

"F. ¿Por qué le dijo que se iba del sitio?

"A. Porque yo suponía que él se vendría detrás de mí.

"F. ¿Qué pasó?

"A. Al caminar dos o tres pasos, sentí el disparo y viré para tras y lo llamé, porque en realidad yo creía que había sido para intimidarme, y cuando me dí cuenta de la realidad, empecé a buscar el revólver.

"F. ¿Lo encontró?

"A. No, señor.

"F. ¿Y por qué supuso que era un revólver?

"A. Me imaginé que sería un revólver, porque yo estuve con él y no le ví ningún revólver. O una pistola, no sé, pero yo no le he visto nada en los bolsillos.

"F. ¿Cómo lo sabe?

"A. Porque yo le puse la mano así y le saqué una cosa que tenía.

"F. ¿Qué era esa cosa?

"A. Un detente de la nena.

"F. ¿Por dónde buscó el revólver?

"A. Por el lado de él.

"F. ¿Movió usted el cuerpo de él?

"A. No, señor.

"F. ¿Qué hizo usted entonces?

"A. Estuve como tres o cuatro minutos con él.

"F. ¿Haciendo qué?

"A. Buscando el arma y viendo si en realidad estaba muerto, porque me imaginaba que era cuestión de meterme miedo nada más.

"F. Entonces, ¿qué hizo usted?

"A. Me vine para la 18." (Exposición del caso, pág. 244-246.)

Presentó el fiscal también la declaración de Josefina Planadeball, esposa del interfecto, quien manifestó que el día de los sucesos el interfecto vestía de blanco, que su revólver estaba guardado en la mesa de noche y que lo entregó a la detective cuando se practicaba la investigación del caso.

La acusada, impugnando la declaración del perito del fiscal en relación con la prueba de la parafina, presentó un boletín impreso, publicado por el Departamento de Justicia de Washington, correspondiente al primero de octubre de 1935, en relación con la prueba de la parafina. Al terminar la prueba del fiscal, la defensa solicitó de la corte que ordenara al jurado que trajese un veredicto absolviendo perentoriamente a la acusada, por ser insuficiente la prueba de cargo. Denegó la corte la moción de la defensa y sometió el caso al jurado con la prueba de cargo solamente, con el resultado que ya conocemos.

Pasemos ahora a considerar los errores señalados por la apelante.

El primero dice así:

"La Corte de Distrito erró al permitir que cierta persona declarase sobre la llamada prueba de la parafina, contra la objeción y excepción de la acusada."

Es sabido que cuando se dispara un arma de fuego, a menos que se use pólvora blanca o que el arma usada esté tan bien ajustada que no permita el escape de gases, los nitratos de la pólvora se adhieren a la mano del que dispara. De manera, pues, que el encontrar nitratos en la mano de una persona de quien se sospecha que ha disparado un arma de fuego, es una circunstancia que tiende a demostrar que la persona disparó el arma. Por consiguiente, tal prueba arroja luz en cualquier investigación de esta índole, y a menos que exista una razón legal para rechazarla, debe ser admitida. Hace cincuenta o setenta y cinco años se descubrió el medio de determinar la presencia o ausencia de nitratos en relación con el disparo de armas de fuego, procedimiento éste que se denominó ''prueba de la parafina o reacción de Lungeen.'' Consiste *la prueba de la parafina* en aplicar parafina caliente, derretida, sobre la parte del cuerpo donde se sospeche la presencia de nitratos. Se forma con la parafina derretida una especie de guante. Al enfriarse la parafina, se retira ésta cuidadosamente y la parte de la misma que ha estado en contacto con el cuerpo es tratada con cierto reactivo, y si en el cuerpo que vino en contacto con la parafina existió nitrato, éste se adhiere a la parafina y al ser tratada con la solución indicada las partículas de nitrato adheridas a la parafina se tornan de un color azul subido. Desde luego, la prueba de la parafina no es absolutamente segura, debido a que existen ciertas circunstancias bajo las cuales la presencia de nitrato en la mano de una persona no significa que ella haya disparado armas de fuego. Por ejemplo, una persona que ha estado fumando o que ha puesto sus manos en contacto con abonos químicos, al dispararse un arma cerca de ella y sometérsele a la prueba de la parafina, dará resultado positivo, es decir, aparecerán los nitratos. Por el contrario, si una persona después de disparar un arma de fuego se lava bien las manos, lo más probable es que el resultado sea negativo. Negativo también

será el resultado si la pólvora usada es pólvora blanca o si el arma es de tal construcción que no permite el escape de los gases que produce la combustión de la pólvora. Por estas razones la prueba de la parafina hay que recibirla con ciertas reservas, pero esto no implica que deba rechazarse, pues como anteriormente dijimos, la presencia o ausencia de nitratos en la mano de la persona sospechada de haber disparado un arma es una circunstancia a considerar en relación con el resto de la prueba.

En el caso de *Commonwealth v. Westwood,* resuelto por la Corte Suprema de Pennsylvania el 23 de noviembre de 1936, 188 A. 304, citado por el fiscal de este tribunal, se sostuvo que la prueba de la parafina en un caso de asesinato es admisible y competente. En el caso de Westwood se aplicó en la misma forma que se hizo en el de autos, con la sola diferencia de que aquí se aplicó al interfecto solamente, porque la acusada no consintió en que se la aplicaran a ella, mientras que en el caso de Westwood se aplicó al acusado y dió resultado positivo. Como se dijo en el citado caso:

"La presencia no explicada de partículas de pólvora parcialmente quemadas en la mano derecha del acusado pocas horas después del disparo, según declararon los químicos, si el jurado creyó que era cierta, era muy significativa. Si la muerte de la víctima se hubiese causado con arma blanca, la presencia inexplicada de sangre humana poco después del crimen, en la mano derecha de uno que tuvo oportunidad de cometerlo hubiera sido significativa."

Y como toda evidencia que tienda a dar luz en uno u otro sentido es admisible a menos que su admisión esté prohibida, actuó correctamente la corte inferior al admitir esta prueba.

De la propia prueba del fiscal surge en este caso la debilidad de la prueba de la parafina y que el jurado no pudo ser inducido a creer que por el solo hecho de que la prueba de la parafina practicada en el interfecto hubiese dado resultado negativo, tenía que tratarse necesariamente de un crimen y no de un suicidio. El jurado oyó toda la extensa

prueba presentada por el fiscal y considerándola toda en conjunto, y entre ella la prueba de la parafina, estimó que la acusada había dado muerte ilegal al interfecto.

A nuestro juicio no existe el primero de los errores señalados.

■ El segundo señalamiento de error dice:

"La Corte de Distrito erró al permitir que un experto declarase que la mano del muerto no estuvo en contacto con arma alguna."

Después de explicar el perito cómo se tomó la prueba de la parafina, le interrogó el fiscal:

"F. ¿Y dice usted que dió resultado negativo?
"T. Sí, señor.
"F. ¿Qué indica eso?
"T. La ausencia de nitratos en la mano.

＊　＊　＊　＊　＊　＊　＊　＊　＊　＊　＊　＊

"F. Qué indica la ausencia de nitratos?
"T. La ausencia de nitratos en la mano del muerto *nos indica a nosotros* que su mano no había venido en contacto con arma alguna para recibir la combustión de la misma.'

A nuestro juicio la contestación del perito es perfectamente correcta y no pudo perjudicar injustamente los derechos de la acusada. Determinar si el interfecto había usado o no el arma era precisamente el objeto que se perseguía con la prueba de la parafina.

Tampoco existe a nuestro juicio el segundo señalamiento de error.

■ El tercero de los errores señalados dice así:

"La Corte de Distrito de San Juan erró al no anular el veredicto del jurado por el fundamento de ser contrario a derecho y a la prueba, y negarse, por ese motivo, a conceder un nuevo juicio a la acusada."

La cuestión primordial a determinar en este caso es si el interfecto murió por suicidio o si otra persona le privó de la vida. La prueba demuestra concluyentemente que el interfecto y la acusada se hallaban solos en el sitio de los

sucesos y no existe posibilidad alguna que la muerte haya sido causada por una tercera persona. Examinemos, por consiguiente, todas las circunstancias que rodean el caso en relación con la conducta de la acusada y la explicación que nos da de lo sucedido.

En primer término, busquemos el móvil para el suicidio. No lo hay. La propia acusada nos dice que habían tenido un disgusto, pero que antes de ocurrir la muerte todo había pasado. Veamos la explicación que nos da la propia acusada.

"F. ¿De qué hablaron?

"A. De un viaje, que yo pensaba ir en enero a Nueva York.

"F. ¿Usted tenía el viaje ése sola o con él?

"A. Sola, con el objeto de ir a coger uno o dos meses de invierno.

"F. Siga.

"A. Entonces él me preguntó que cuándo yo me iba y yo le dije: 'En la primera semana de enero', y me dijo que sola no podría dejarme ir, que nosotros teníamos que resolver nuestra situación.

"F. ¿Qué situación?

"A. La situación nuestra.

"F. ¿Cuál era la situación?

"A. La situación de ser nosotros dos casados.

"F. Siga.

"A. Hablamos y él me dijo: '¿Tu determinación es ésa?' y yo le dije: 'Sí, me voy en la primera semana de enero.' Porque él quería irse a fines de enero porque él tenía que arreglar unos asuntos antes porque él quería que no volviéramos más acá, por lo pronto.

. . . . . . . . . . .

"A. Yo me levanté y le dije que me iba, y él me dijo: '¿Te vas?', y yo le dije: 'Sí', y caminé dos o tres pasos . . .

"F. ¿Por qué le dijo que se iba del sitio?

"A. Porque yo suponía que él se vendría detrás de mí.

"F. ¿Qué pasó?

"A. Al caminar dos o tres pasos, sentí el disparo y viré para atrás y lo llamé, porque en realidad yo creía que había sido para intimidarme, y cuando me di cuenta de la realidad, empecé a buscar el revólver. (Exposición del caso, pág. 245.)

. . . . . . . . . . .

"F. ¿La sola cuestión que trataron fué la del viaje a Estados Unidos?

"A. Sí, señor.

"F. ¿No hubo contrariedad ninguna?

"A. No, él me dijo que no me dejaba ir sola.

"F. ¿Qué motivo era ése para que él se pegara un tiro?

"A. No sé, nunca me lo pude imaginar.

"F. ¿Ustedes no tenían disgustos?

"A. Sí, señor, pero nunca había sucedido nada.

"F. ¿Usted sospechaba que él pudiera tomar una actitud de esa naturaleza?

"A. No, señor." (Exposición del caso, pág. 247.)

Si algún motivo hubiera existido para el suicidio, es indudable que la acusada no hubiese vacilado en declararlo, pues ello contribuiría a su absolución. Por él contrario, la prueba demuestra que si algún deseo tenía el interfecto era el de vivir, y lo revela el hecho de que quería a su esposa y a sus hijos y que aquel mismo día, horas antes de su muerte, en la casa de Marcia Corretger repetidas veces sostuvo en presencia de varias personas y sin importarle disgustar a la acusada, que no quería divorciarse, que su esposa no le había dado motivos y que no estaba dispuesto a abandonarla a ella ni a sus hijos.

Sin embargo, a poco que se reflexione sobre la prueba, encontraremos las razones que pudo tener la acusada para matar al interfecto. La prueba demuestra que aquel día, en el almuerzo en la casa de Marcia Corretger, la acusada y el interfecto habían tenido un disgusto. Primero, por haberlo visto hablando con una señora en el "Wonder Bar" y no haber ido inmediatamente donde la acusada, diciendo ésta que ella "era primero que nadie." Después, por la insistencia de la acusada, que pretendía que el interfecto se divorciara y se fuese con ella para Estados Unidos, y la firme resolución de aquél de no abandonar a su esposa y a sus hijos. En tales circunstancias, la acusada, que tenía la pretensión de ser "primero que nadie", como ella decía, se sentía derrotada por la legítima esposa del interfecto. Su orgullo de mujer estaba humillado. No era antes que la

esposa, y es fácil imaginar hasta dónde puede llegar una mujer en tal situación. Su estado de ánimo en aquel día lo demuestra el papel que después de la discusión del mediodía le dejó en la oficina y que decía así:

"Planas, te quiero. Si eres mío o no, dímelo. Siempre tuyo hasta el capullo."

Su resolución probablemente fué la que frecuentemente se toma en tales casos: YO O NADIE. Y la·única forma de llevar a cabo tal resolución era quitándolo del medio, y para asegurar su impunidad, momentos antes le registra los bolsillos y se cerciora de que no tenía armas. Véase lo que resulta de su propia declaración:

"F. ¿Y por qué supuso que era revólver?

"A. Me imaginé que sería un revólver, porque yo estuve con él y no le vi ningún revólver. O una pistola, no sé, pero yo no le he visto nada en los bolsillos.

"F. ¿Cómo lo sabe?

"A. Porque yo le puse la mano así y le saqué una cosa que tenía.

"F. ¿Qué era esa cosa?

"A. Un detente de la nena. (Exposición del caso, 245–246.)

Lo lógico, lo natural, era que dada la índole de la herida que instantáneamente ·lo mató, y si no lo mató, por lo menos lo dejó exánime, lo natural, repetimos, es que el arma hubiera quedado en la mano que la usó, o de lo contrario muy cerca de la misma. Sin embargo la acusada la buscó con sumo interés por espacio de tres o cuatro minutos, según declaró, y no la encontró. No es posible pensar que después de recibir una herida como la que recibió el interfecto, pudiese tirar el arma al mar, a varios metros de distancia del sitio donde se hallaba al recibir el balazo. Ninguna otra persona había por allí en aquellos precisos momentos que pudiera haber cogido el arma. ¿No es ésta una circunstancia más demostrativa de que no se trataba de un suicidio y sí de un crimen? Sin embargo, momentos después de los sucesos la acusada sostuvo una conversación con Modesta Rivas, en la

habitación de Marcia Corretger, y cuando la testigo Rivas se sorprendió de que Planadeball hubiera podido suicidarse porque ella no le había visto aquel día armas, la acusada le dice entonces que él tenía su revólver, que ella se lo había quitado unos días antes, pero que aquella tarde él insistió en que se lo prestara y ella se lo entregó. En aquel mismo momento la acusada guardaba un revólver en su cartera, no sin antes limpiarlo con la mano. Compárense estas dos situaciones contradictorias de la acusada y considérese además la circunstancia de que según resultó de la declaración de la señora Planadeball el revólver del interfecto estaba en su casa el día de los sucesos, guardado en una mesa de noche y fué entregado por ella a la detective, después de la muerte de su esposo, y ofrecido en evidencia.

Otra circunstancia más a considerar en este proceso es el correr la acusada inmediatamente después de la muerte del interfecto a cambiarse de traje y ordenar que lo destruyeran, que lo quemaran, etc. Si era que el traje le traía recuerdos que no quería conservar, ¿por qué no destruyó también la cartera, el sombrero, etc.? ¿No era acaso que el traje la incriminaba? ¿Por qué antes de conferenciar con el Jefe de la Detective, Sr. Lloréns, en la mañana del 23 de diciembre, tuvo buen cuidado la acusada de pasar por la casa de Marcia Corretger para cerciorarse que el traje había desaparecido de acuerdo con sus instrucciones? Tratando de desvirtuar todas o algunas de estas circunstancias que hemos señalado, la defensa sugiere que todas estas actuaciones de la acusada, inconsistentes con su inocencia, se debieron a que era una señora casada, de familia distinguida, y no quería verse envuelta en un escándalo de esta índole. Este argumento no resiste el más ligero análisis ante la fuerza irresistible de los hechos. Sus relaciones con el interfecto eran públicas y notorias. No se ocultaban para salir juntos por las calles y sitios públicos de San Juan. Ella misma nos dice en su declaración que la tarde del crimen pensaban comer juntos

en la "La Mallorquina" y luego pasar un rato por la noche en "El Escambrón." Ella misma declara que se escribían diariamente por correo y a veces se comunicaban por telégrafo. Su propio esposo, según ella declaró, al leer el lunes 23 el relato que hacía *"El Mundo"* del hallazgo del cadáver de Planadeball, a pesar de que el nombre de la acusada no aparecía en la reseña, se atrevió a preguntarle si ella no estaría envuelta en el asunto. ¿Por qué tenía que sospechar así de su esposa? ¿No era esto indicio de que las ilícitas relaciones de ella con el interfecto eran conocidas, o por lo menos sospechadas, por el esposo? ¡Y la acusada no se indignó al oír tales palabras en boca de su marido!

Además de todas estas circunstancias, existe la de que la herida no presentaba tatuaje, lo que de acuerdo con el informe pericial significaba que la boca del cañon del arma tuvo que hallarse, al ser disparada, a una distancia mayor de diez y seis pulgadas del cráneo del interfecto, pues si hubiera estado a una distancia menor de diez y seis pulgadas el tatuaje hubiera aparecido. No es lógico pensar que una persona que se dispone a suicidarse tome la precaución de colocar el arma de tal forma que la boca del cañón quede a una distancia mayor de diez y seis pulgadas. Y a todo esto agréguese si se quiere que la prueba de la parafina demostró que en la mano del interfecto no había indicio de nitrato, a pesar de que la pólvora que se encontró en el fogonazo del sombrero era de la llamada pólvora negra.

Es verdad que la jurisprudencia y la experiencia indican que la prueba circunstancial por indicios debe ser estudiada y recibida con cautela, pero cuando esa prueba es, como en este caso, incompatible con cualquier teoría razonable de inocencia, la prueba de indicios o circunstancial es suficiente para sostener un veredicto de culpabilidad. A nuestro juicio, la prueba que tuvo ante sí el jurado no justificaba otro veredicto que el de culpabilidad, y si de algo pecó, fué de benevolencia al no declararla culpable de asesinato en segundo

grado. Tampoco erró el juez inferior al denegar el nuevo juicio por insuficiencia de prueba.

No existe, a nuestro juicio, el tercero de los errores señalados.

 El cuarto señalamiento de error dice así:

"La Corte de Distrito de San Juan erró al ignorar la teoría del suicidio en sus instrucciones al jurado y al hacer caso omiso de las manifestaciones exculpatorias contenidas en la declaración escrita de la acusada que fué presentada como prueba por el fiscal."

En las instrucciones transmitidas al jurado se halla una que dice así:

"Si los Señores del Jurado, por el resultado de la prueba practicada, entienden que el Fiscal no ha probado delito alguno cometido por esta acusada, *ni que se ha probado más allá de toda duda razonable que la muerte de Salvador Planadeball se debió a acto alguno realizado por la acusada; o si creen los Señores del Jurado, por el resultado de la prueba practicada, que Salvador Planadeball se suicidó*; o si entienden que hay duda razonable y fundada en cuanto a. la culpabilidad de la acusada, *en cualquiera de estos casos* el deber del jurado es rendir un veredicto de no culpable."

Es cierto que cuando se presenta en evidencia la confesión o admisión del acusado que contiene manifestaciones exculpatorias, debe instruirse al jurado que tales manifestaciones deben ser consideradas como ciertas a menos que se destruyan. *Yarborough* v. *State,* 67 S. W. (2d) 612; *Combs* v. *State,* 108 S. W. 649. Pero tal regla no es aplicable a un caso como el presente en que la declaración de la acusada no contiene confesión ni admisión alguna. Toda ella va encaminada a demostrar que el interfecto se suicidó, y que ella no tuvo participación alguna en su muerte.

Los casos de *Combs* v. *State* y *Yarborough* v. *State,* supra, no son de aplicación al de autos. En el primero, se trataba de una verdadera admisión. En aquel caso, el acusado admitió que él había dado muerte al interfecto, pero que la muerte fué causada por accidente, de modo que no hubo

intención criminal. Se sostuvo allí que la corte, de su propia iniciativa, debió instruir al jurado que incumbía al gobierno destruir la prueba de que la muerte había sido accidental.

En el segundo, en el de *Yarborough* v. *State, supra,* también se trataba de una admisión. Allí el acusado admitió que lanzó sobre la interfecta el cubo conteniendo la gasolina que se inflamó, y causó su muerte, pero a la vez alegó que lo había hecho por error al tratar de coger otro cubo de agua que había allí.

En el caso de *People* v. *Fowler,* 178 Cal. 657, 664, la Corte Suprema de California establece claramente la distinción entre confesión y admisión en la siguiente forma:

"Una confesión en derecho penal es una admisión o manifestación por una persona acusada de un crimen al efecto de que es culpable del mismo. Una admisión se distingue de una confesión en el hecho de que el término 'admisión' en materia penal se refiere a cuestiones de hecho que no envuelven intención criminal mientras que una confesión es un reconocimiento de culpabilidad. 2 *Wharton's Criminal Evidence,* 10a. ed.,622."

*People* v. *Elder,* 55 Cal. App. 644, 204 P. 29.

Tampoco existe el cuarto de los errores imputados a la corte sentenciadora.

[6] El quinto de los errores señalados dice así:

"La Corte de Distrito de San Juan erró al dar instrucciones de homicidio en este caso y al prescindir de los distintos grados o modalidades del mismo, habiendo servido el error ante el jurado como 'compromise' o medio para condenar a la acusada en alguna forma."

Bajo este señalamiento de error se queja la acusada de que la corte transmitió al jurado instrucciones de homicidio voluntario.

A nuestro juicio estuvo la corte justificada en transmitirlas, porque de la evidencia resultó que la acusada y el interfecto habían tenido disgustos el día de autos, que tuvieron discusiones agrias, primero en casa de Marcia Corretger y

después volvieron a repetirse en la playa del Condado. Además, el interfecto presentaba una erosión en una mano.

La prueba es tan fuerte contra la acusada, que en el supuesto de que no hubiera existido base en la evidencia para transmitir instrucciones de homicidio voluntario, el error, de haberse cometido, lejos de haber sido perjudicial, fué beneficioso a la acusada y por lo tanto no puede producir la revocación de la sentencia.

■ Pasemos ahora al sexto y último de los errores señalados. Se expone así:

"La Corte de Distrito de San Juan erró al negarse a transmitir al jurado la instrucción segunda solicitada por la defensa."

Consiste este alegado error en que la corte sentenciadora rehusó transmitir la siguiente instrucción:

"La Corte instruye a los señores del jurado que meras sospechas no constituyen prueba de culpabilidad, no importa cuán graves y fuertes éstas sean, y la acusada debe ser exonerada libremente a menos que el hecho de su culpabilidad se pruebe fuera de toda duda razonable con exclusión de cualquiera otra hipótesis razonable de su inocencia que sea compatible con los hechos probados."

La instrucción solicitada no sólo tiende a confundir al jurado por el lenguaje en que está redactada, sino que está incluída en la siguiente instrucción general que fué transmitida al jurado:

"En este caso ustedes oyeron hablar en los argumentos de la prueba circunstancial. Ya les dije lo que es prueba directa. Hay también dos clases de prueba, que son reconocidas y admitidas por todos los tribunales de justicia, y en virtud de las cuales el jurado puede declarar y encontrar a un acusado culpable de un delito; una es la prueba directa, o sea aquélla que se produce por el testimonio directo o positivo de un testigo respecto a la comisión de un delito. Ya les expliqué que la persona que ve firmar un documento es prueba directa de que el documento se firmó. Ésa es la prueba ocular. La otra clase de prueba es aquélla que se produce por el testimonio de

una serie de acontecimientos entrelazados entre sí y que tienden a señalar, de manera suficientemente poderosa, la comisión de un delito por el acusado. Esta prueba, que se llama prueba circunstancial o prueba de indicios, puede consistir en admisiones del acusado, en amenazas hechas con anterioridad a la comisión del crimen, tendientes a demostrar que existía por parte suya animosidad del delito, o cualquier otro acto, declaración o circunstancia, admitidos como prueba, que tiendan a enlazar al acusado con la comisión del delito. Nada hay en la naturaleza de la prueba circunstancial o de indicios que la haga menos segura que la otra clase de prueba, o sea la prueba directa. Pero la corte instruye a ustedes que para declarar culpable a un acusado por evidencia circunstancial solamente, es necesario no sólo que todas las circunstancias concurran para demostrar que él cometió el delito de que se le acusa, sino que tales circunstancias sean inconsistentes con cualquier otra conclusión razonable. No es suficiente que las circunstancias probadas coincidan, concuerden y hagan probable la hipótesis buscada para establecer el objeto de la acusación, sino que deben excluir cualquier otra hipótesis fuera de la culpabilidad. Es decir, que en casos en que la prueba sea de indicios deben probarse hechos que sean no solamente compatibles con la culpabilidad del acusado, sino que también sean incompatibles con toda razonable hipótesis de inocencia; y cada hecho aislado del que se ha de hacer la deducción de culpabilidad, debe demostrarse por medio de pruebas que satisfagan el ánimo y la conciencia del Jurado en el mismo grado en que es necesario satisfacerlos con respecto al hecho en cuestión en casos en que la prueba sea directa.''

No estando obligada la corte sentenciadora a transmitir una instrucción especial incluída en las generales, tenemos que llegar a la conclusión que no cometió el sexto y último de los errores imputádosle.

No existiendo ninguno de los seis errores que señala la apelante, ni resultando del examen que hemos hecho de los autos que se haya cometido algún otro que perjudique los derechos sustanciales de la acusada, *procede desestimar el recurso y confirmar la sentencia apelada.*

El Juez Asociado Sr. Travieso no intervino.