EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CASI-
MIRO BERENGUER, acusado y apelante.

Núm. 8470.—*Sometido:* Junio 5, 1941. *Resuelto:* Julio 8, 1941.

*Abelardo Casanova Prats, F. Acosta Velarde* y *Frank Torres,* abogados del apelante; *Hon. Procurador General George A. Malcolm, R. A. Gómez, Fiscal del Tribunal Supremo* y *Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

Casimiro Berenguer con otras personas fué acusado de haber asesinado el 25 de julio de 1938, en Ponce, a Luis A. Irizarry, Coronel de la Guardia Nacional de Puerto Rico.

La acusación se formuló en agosto 1, 1938, y al día siguiente todos los acusados pidieron a la corte que ordenara al fiscal que les entregara un ''bill of particulars'' especificando la participación de cada uno en el crimen. Oídas ambas partes sobre la moción, la corte la declaró sin lugar.

En agosto 16, 1938, pidieron los acusados juicios por jurado, separadamente, y en enero 7, 1939, este acusado, Casimiro Berenguer, por medio de su abogado, solicitó que el proceso fuera sobreseído en cuanto al mismo, por no habérsele sometido a juicio dentro del término legal de ciento veinte días. El sobreseimiento fué denegado.

En enero 9, 1939, se llamó la causa para juicio. Comenzó a constituirse el jurado y después de un procedimiento laborioso que llena más de cien páginas del récord y de haber dicho la defensa ''aceptamos que no vamos a recusar a más nadie'' y el fiscal ''aceptamos definitivamente al jurado'', la defensa pidió la inmediata disolución del jurado por alegados errores en su formación.

La moción fué declarada sin lugar y la defensa se dirigió a la corte en los siguientes términos:

''Con nuestra excepción. Con la venia de la corte, hay otra cuestión. Considerando, señor Juez, la moción que acaba de declarar S. Sa. sin lugar; considerando señor Juez, que la cuestión de justicia, que requería el ejercicio por parte del tribunal de una sana discreción; considerando además, señor Juez, que nuestra obligación como abogado es respetar los criterios y resoluciones que emita un tribunal en Puerto Rico, no importa cuál sea el criterio personal que tengamos en relación a ese asunto; considerando, señor Juez, el ambiente que hay en el fondo de este caso, y considerando que nuestra misión como abogado debe ser la de tratar de ser insistentes en todo lo posible y consistentes con nuestras propias alegaciones, vamos a plantear ahora una cuestión que hemos estado meditándola desde hace mucho tiempo, desde antes de ser señalado este caso. Quisimos plantearla desde antes de verse ninguno de los demás casos, a través de una impugnación general al jurado a base de prejuicio y mediante una moción de disolución del jurado que fué declarada sin lugar; considerando que si nosotros reprodujéramos nuevamente esas mociones, nuevamente serían declaradas sin lugar; considerando globalmente todas estas

cuestiones básicas y accesorias, fundamentales e incidentales que han mediado en esta cuestión, este abogado, previo consentimiento del acusado, por la presente formalmente pide juicio por tribunal de derecho y renuncia definitivamente al jurado.''

La cuestión suscitada fué ampliamente discutida en corte abierta y resuelta finalmente en sentido favorable. ''Como es un derecho del acusado, un privilegio,'' dijo la corte, citando los casos de *Ex parte Mauleón*, 4 D.P.R. 123, 130 (2ª. ed.) y *El Pueblo v. Sutton*, 17 D.P.R. 345, se ''admite el cambio, y el juicio seguirá por el tribunal de derecho.''

Al día siguiente preguntó el juez a las partes si estaban listas. Ambas contestaron afirmativamente y comenzó el juicio.

Seguidamente la defensa manifestó a la corte que había testigos de cargo que no figuraban al dorso de la acusación. Se suscitó una discusión entre el fiscal y la defensa, pidiendo ésta por último ''que no se permita la declaración de testigos que no han sido notificados antes de ahora.'' Se opuso el fiscal invocando el caso de *El Pueblo v. Navarro*, 40 D.P.R. 178 y la corte basándose en la decisión invocada resolvió ''que estos testigos pueden declarar, aunque no estén al dorso de la acusación.''

Practicada la prueba de cargo, la defensa presentó una moción de *nonsuit*. Desestimada, introdujo su evidencia, terminando el juicio el 13 de enero de 1939. Tres días después pronunció la corte la siguiente sentencia:

''Siendo hoy el día señalado para dictar sentencia en este caso, está presente el acusado Casimiro Berenguer, su abogado Lic. J. M. Toro Nazario y el Fiscal del Distrito, señor Guillermo S. Pierluisi.

''La vista de este caso se celebró durante los días 10, 11 12 y 13 de enero de 1939 por Tribunal de Derecho, por haberlo solicitado el acusado, después de haber renunciado expresamente a ser juzgado por un jurado.

''La corte, después de haber considerado y apreciado debidamente y en conjunto toda la evidencia presentada por ambas partes en este caso, y vistos los artículos 36, 39 (apartado 8°.), 199, 200, 201 y

202 del Código Penal (edición de 1937, texto inglés) y la jurisprudencia aplicable, por la presente dicta sentencia declarando, como
declara, al acusado Casimiro Berenguer, culpable y convicto del delito
de asesinato en primer grado, y en consecuencia condenando, como
condena, a dicho acusado Casimiro Berenguer, a la pena de reclusión perpetua en el Presidio Insular de Puerto Rico, donde permanecerá constantemente.

"Esta sentencia se dicta sin imposición de costas, por ser insolvente el acusado."

Pidió el acusado a la corte que decretara la nulidad de
la misma por ser contraria al artículo 309 del Código de
Enjuiciamiento Criminal y porque le negó la oportunidad de
hacer alegaciones conforme a ley.

La corte, en enero 18, 1939, por medio de una resolución
fundada, dejó subsistente la declaración de culpabilidad contenida en la sentencia y anuló su parte dispositiva o punitiva, fijando el 23 del propio mes de enero, para dictarla
quedando notificados el acusado y el fiscal.

En el día señalado compareció el acusado y presentó una
moción de nuevo juicio. Dos días después la corte la declaró
sin lugar y procedió a condenar como condenó a Berenguer
a reclusión perpetua en el presidio insular, con trabajos forzados.

Contra esa sentencia fué que la parte perjudicada interpuso el presente recurso de apelación, cuya vista se celebró
el cinco de junio último.

Diez y ocho errores se señalan. Los dos primeros se refieren al pliego de particulares y a la petición de archivo y
sobreseimiento. Los cinco siguientes guardan relación con
la renuncia al juicio por jurado. El octavo, el noveno, el
décimo y el undécimo se formulan con motivo de la práctica
de la evidencia. Por el trece, el catorce y el quince se imputa error a la corte al apreciar la prueba, al actuar movida
por pasión, prejuicio y parcialidad y al no inhibirse del conocimiento de la causa. El diez y seis sostiene que la sentencia es nula por ser contraria a la ley, el diez y siete que

86

debió concederse un nuevo juicio y el diez y ocho que debe revocarse la sentencia.

■ El pliego de particulares fué solicitado por todos los acusados y para sostener que no existe el error que se señala bastaría referirnos a nuestra decisión en el caso del *Pueblo* v. *Escobar,* 55 D.P.R. 505, 510.

Cuando el acusado pidió y obtuvo un juicio por separado, no insistió. Sin embargo, en el acto de la vista, con motivo de la deficiente presentación de su caso por parte del fiscal al comenzar la vista, renovó la cuestión e insistió en que se le informara por el ministerio público más detalladamente sobre los actos concretos que se le imputaban. Creemos que el debate judicial pudo haberse planteado de modo más franco si el fiscal hubiera proporcionado al acusado los datos que le pedía y que la corte debió ordenarle que lo hiciera, pero no que el error que pudiera haberse cometido perjudicara los derechos substanciales del acusado y por tanto que pueda servir de base para una revocación de la sentencia.

No hay duda de que el caso del *Pueblo* v. *Colón,* 52 D.P.R. 413 que cita el apelante, le favorece, pero no hasta el extremo que pretende. Aquí, como en el propio caso invocado, concurren circunstancias que llevan a la corte, no obstante el error, a concluir que no se perjudicaron los derechos del acusado.

■ La justa causa para que el juicio no se celebrara dentro de los ciento veinte días que marca el número segundo del artículo 448 del Código de Enjuiciamiento Criminal, quedó demostrada. En su consecuencia no erró la corte al negar la moción de sobreseimiento. Parece conveniente transcribir de la resolución que a ese efecto dictara, lo que sigue:

"La corte ha visto y oído la moción de archivo y sobreseimiento presentada por la defensa del acusado; también ha tomado en consideración la evidencia presentada por el fiscal para demostrar que ha habido justa causa en la demora para la celebración de este caso; ha tomado, también, en consideración la prueba presentada por la

defensa con respecto al número y condiciones de los casos vistos por la corte durante ese período de tiempo.....

"En este caso la acusación fué radicada contra nueve acusados, conjuntamente, entre los cuales se encuentra el peticionario de esta moción de archivo y sobreseimiento, que se llama Casimiro Berenguer.

......

"Presentada la acusación el ·1 de agosto de 1338,....la corte señaló el juicio *para todos los acusados, conjuntamente,* para el día *22 de agosto de 1938.* Con fecha 16 de agosto de 1938 los acusados pidieron juicio por separado y, en virtud de ello, se señaló el primer juicio contra Elifaz Escobar, uno de los acusados, para el día 29 de agosto de 1938. . . .

"...Este juicio de Elifaz Escobar empezó el 29 de agosto y terminó el 1 de septiembre·de 1938.

"La corte hizo nuevo señalamiento contra el acusado Tomás López de Victoria dentro de la misma acusación en que está dicho acusado Casimiro Berenguer, y se señaló el segundo caso de estos juicios, para el día 19 de septiembre de 1938. Este caso de Tomás López de Victoria empezó el día 19 de septiembre y terminó el 26 de septiembre, que fué cuando el jurado rindió veredicto.....

"Después el juicio contra Santiago González Castro empezó el 10 de octubre de 1938, todavía dentro de los ciento veinte días, y terminó con el veredicto del jurado el día 15 de octubre de 1938....

"El cuarto juicio de esta serie bajo la misma acusación conjunta, fué el de El Pueblo de Puerto Rico contra Prudencio Segarra, que fué señalado por esta corte para el día 1 de noviembre de 1938, justamente dentro de los ciento veinte días de haberse presentado la acusación.....

"El quinto juicio de esta serie y bajo la misma acusación conjunta, fué el de El Pueblo de Puerto Rico contra Juan Pietri, que fué señalado por esta corte para el día 19 de diciembre de 1938 y terminó el día 22 de diciembre del mismo mes (sic), dictándose sentencia el 27 de diciembre de 1938.

"El sexto juicio de esta serie, y bajo la misma acusación conjunta, es el de El Pueblo de Puerto Rico contra Casimiro Berenguer, señalado para hoy día 9 de enero de 1939; no habiéndose señalado entre el período comprendido entre el 23 de diciembre de 1938 y el 8 de enero de 1939 por ser ése el período de Navidad, Año Nuevo y Reyes, y ser difícil durante ese período, en que hubo, además, tantos días de fiesta, conseguir la citación y comparecencia de numerosos jurados y testigos de ambas partes para la celebración del juicio."

En el caso del *People* v. *Moran,* 144 Cal. 48, 57, citado por el propio juez de distrito al dictar su resolución, en el que se decidió que había existido una justa causa para la dilación, se dijo:

"No creemos que la suspensión de los juicios criminales durante la semana que sigue al día de Navidad sea un procedimiento irrazonable.

"Además de todo esto, a Buckley se le celebró juicio dentro de los sesenta días, y el hecho de que este acusado, a quien se le imputó conjuntamente el mismo delito, hubiese solicitado y se le hubiese concedido un juicio por separado era justa causa para su posposición para una fecha cuando la corte podría asumir con certeza que el caso de Buckley habría concluído."

Tampoco se cometieron los errores tercero al séptimo. Como sabemos, fué el propio acusado el que renunció al juicio por jurado. Eso no obstante, en diversas formas sostiene ahora que la corte de distrito erró al resolver la cuestión en su favor. Limitaremos nuestro estudio a la substancia del argumento.

Se trata de un derecho renunciable. Esta propia corte en el caso de *El Pueblo* v. *Plata,* 43 D.P.R. 464, 467, dijo:

"No comprendemos por qué no se le permitió al acusado renunciar al juicio por jurado para ser sometida su causa al tribunal de derecho. Si fué por temor de que alegase después haber estado expuesto por el mismo delito (*former jeopardy*), como manifestó el fiscal de este tribunal en la vista ante nosotros, ya ha sido resuelto que tal alegación no es sostenible cuando el jurado ha sido disuelto a moción del acusado y con su consentimiento. 16 C. J. 254, párrafo 409."

La circunstancia de que aún subsista la disposición contenida en el artículo 2 del Código de Enjuiciamiento Criminal, acerca de que "en causas por delitos que aparejen pena de muerte el veredicto deberá ser por jurado", no impide la renuncia, habiéndose abolido como lo fué con posterioridad a la aprobación del Código, la pena de muerte en Puerto Rico. Ley núm. 42 de 1929, pág. 233.

El mandato legislativo estaba subordinado a la existencia de la pena de muerte. Abolida ésta, desapareció la razón de la ley y quedó la disposición sin efecto aunque no fuera expresamente derogada. Pretender que los tribunales la sigan aplicando a los casos que antes se castigaban con la pena capital, sería pedirles que legislaran y ellos no tienen esa facultad.

▆ Por el octavo señalamiento se imputa error a la corte por haber permitido a los testigos Pablo Quiñones, Narciso Majes, Eladio Ayala Delucca y Guillermo Larragoiti Coimbre que declararan sobre hechos ocurridos en julio 20, 1938, que no fueron alegados en la acusación, y por el noveno se sostiene que también erró la corte al permitir al testigo Pedro José Chardón que declarara sobre hechos tampoco alegados en la acusación.

En la acusación se alegó que en ocasión de celebrarse una parada en Ponce en conmemoración del aniversario de la entrada del Ejército de los Estados Unidos en la Isla, estando el Gobernador de Puerto Rico en una plataforma frente a la Casa Consistorial, con otras personas que se nombran observando el desfile, ''allí y entonces, ilegal, voluntaria y criminalmente, con malicia, premeditación, deliberación y propósito firme y decidido de dar muerte ilegal al ser humano, Hon. Blanton Winship, Gobernador de Puerto Rico, y mediante acecho, escondiéndose detrás del público que, a corta distancia, frente a la referida plataforma, observaba igualmente el desfile de dicha parada, y haciendo uso de revólveres, armas mortíferas, acometieron al Hon. Blanton Winship, haciéndole numerosos disparos, hiriendo con uno de ellos en el pecho, al ser humano Luis A. Irizarry, Coronel de la Guardia Nacional de Puerto Rico, y atravesándole la arteria y la vena pulmonar, a consecuencia de lo cual falleció dicho Luis A. Irizarry horas después.''

Las declaraciones de los testigos objetados se refirieron a cierta reunión de nacionalistas celebrada unos días antes

del 25 de julio de 1938, bajo la presidencia del acusado, en la cual se acordó obstruir la parada y matar al Gobernador, y el apelante sostiene que imputándosele en la acusación el solo hecho de disparar contra el Gobernador, las declaraciones no eran permisibles. No tiene razón el apelante a nuestro juicio.

La acusación imputó a Berenguer y a los otros coacusados el delito de asesinato del Coronel Irizarry cometido en la forma y bajo las circunstancias que especifica. Aunque no lo exprese, lleva consigo la alegación de una conspiración y sobre la conspiración versaron las declaraciones.

En la citada decisión del caso del *Pueblo* v. *Escobar,* 55 D.P.R. 505, 523, se transcribe con aprobación lo que se dice en 2 Warren *On Homicide* 133, sec. 182, a saber:

"Cuando una acusación imputa al acusado y a sus coacusados. conjuntamente el haber cometido el delito de asesinato, eso es suficiente para autorizar al estado a introducir cualquier evidencia competente en relación con una conspiración, tal como dicha conspiración ha sido sustentada por la acusación, aun cuando haya una ausencia absoluta de alegación de conspiración en la acusación con respecto al acusado apelante. Tal acusación, que conjuntamente le imputa a varios acusados el delito de asesinato, implica en sí y lleva consigo una conspiración."

El error décimo es el que se señala como cometido por la corte al permitir que declararan ciertos testigos cuyos nombres no figuraban al dorso de la acusación.

El asunto caía dentro de la discreción de la corte y no se ha demostrado que se abusara por ésta de su facultad. No hubo error. *Pueblo* v. *Dones,* 56 D.P.R. 211; *Pueblo* v. *Kent,* 10 D.P.R. 343, 346, 388.

No es necesario que nos detengamos en la consideración del undécimo señalamiento de error. Bastará decir que al introducir su evidencia, renunció el acusado a su moción de *nonsuit. Pueblo* v. *Ojeda,* 26 D.P.R. 438; *Pueblo* v. *González,* 24 D.P.R. 713.

El duodécimo señalamiento se formula así:

"La corte inferior cometió error al no facilitar los medios para oír en persona la declaración de Clementina Solís de Mercado referente al sitio en que se hallaba el acusado la noche del 20 de julio de 1938; errando asimismo al no darle crédito a lo estipulado por el fiscal y la defensa que declararía esta señora, sin haberla visto declarar en persona."

No obstante haber anunciado la defensa que estaba lista para juicio, pidió la citación de la testigo cuatro días después de comenzado. Además se avino a que la declaración se presentara en la forma que estipuló con el fiscal. No tiene en verdad motivo de queja. Véase *Pueblo* v. *Sarria,* 57 D.P.R. 882.

Y en cuanto a que la corte estuviera obligada a dar crédito a la declaración, la contención del apelante carece de fundamento. El caso de esta corte que invoca—*Caballero* v. *González,* 53 D.P.R. 539—no es aplicable. Lo que en él se resolvió fué que "el testimonio positivo de un testigo no contradicho, sobre un hecho determinado, debe merecer crédito a la corte a menos que su versión sea físicamente imposible, inverosímil, o que por sus contradicciones, o su conducta en la silla testifical, se haga indigno de crédito", y aquí el testimonio de la testigo con respecto a que el acusado se encontraba en determinada reunión espiritista en la noche en que otros testigos dijeron que presidió aquélla en que se acordó el asesinato, fué contradicho por el dicho de esos otros testigos. La prueba al admitirse lo fué sin privilegio alguno. Quedó sujeta a ser apreciada lo mismo que la demás aportada por las partes.

▆▆▆▆▆ Por el décimotercer señalamiento se sostiene que la corte erró de modo manifiesto al apreciar la prueba y por el décimocuarto que actuó además movida por pasión, prejuicio y parcialidad.

No encontramos en los autos rastro alguno de pasión, prejuicio o parcialidad por parte del juez de distrito al actuar en este caso. Difícil fué la dirección del mismo y complicada. Lo que los autos ponen de manifiesto en verdad es

su esfuerzo constante por que ambas partes tuvieran la oportunidad de hacer valer sus derechos, sin extralimitaciones.

La prueba fué contradictoria en algunos extremos. Era de la incumbencia de la corte resolver los conflictos y no encontramos error en la forma en que los resolvió. No estaba obligado el juez a creer como no creyó la prueba de coartada y pudo dar crédito como dió a los testigos que declararon aportando los datos necesarios para basar la sentencia que dictara.

No resumiremos toda la evidencia. Es muy extensa. La aportada sobre los hechos ocurridos el 25 de julio que culminaron en la muerte del Coronel Irizarry es completa y convincente. Bastará que nos refiramos a aquélla que pone de manifiesto la participación del acusado en la comisión del crimen.

Pablo Quiñones, residente en Ponce y miembro del partido Nacionalista, dijo que el acusado era el presidente del partido en Ponce allá para julio de 1938; que el veinte de ese mes como a las ocho de la noche hubo una reunión de la junta nacionalista a la que asistieron el acusado, López de Victoria, Prudencio Segarra, Elifaz Escobar y Angel Antongiorgi, acordándose en ella ''que no se dejara dar la parada'' que se iba a celebrar el veinte y cinco de julio y ''que se matara al gobernador y a toda la gente en el templete''. Presidió la reunión el acusado. El día de la parada vió disparar a Antongiorgi y a Segarra.

Narciso Majes, vecino de Ponce, de setenta y un años de edad, vive al lado del Club Nacionalista, conoce al acusado que tenía una zapatería al frente y recuerda que en la noche del veinte de julio hubo una reunión en el club. Vió entrar varias personas, entre ellas al acusado. Después de los sucesos del veinte y cinco de julio se cerró el club.

Eladio Ayala Delucca vivía también cerca del Club Nacionalista. En la noche del veinte de julio vió al acusado que entraba al club como de costumbre.

Guillermo Larragoiti Coimbre, de veinte y un a veinte y dos años de edad, nacionalista, manifestó que el veinte de de julio de 1938 pasó por la Junta Nacionalista de Ponce y encontró al acusado y a Juan Pietri y el acusado dijo ''que había que vengar en Ponce el veinte y uno de marzo; que había que matar al Gobernador Winship y a los que estaban en el templete, y yo le dije que a eso no me metía. Me dijo que si tenía miedo y le contesté que yo no le tenía miedo a nadie.''

Ramón Pérez Brun vió al acusado el día de los sucesos— veinte y cinco de julio—cerca del sitio en que ocurrieron.

Pedro José Chardón declaró que el veinte y cinco de julio era nacionalista, que el acusado era el presidente del partido. El veinte y cuatro de julio ''venía de trabajar, López de Victoria''—uno de los coacusados—''me llamó y me dijo que habían tenido una reunión presidida por Casimiro Berenguer y que Berenguer me había escogido a mí como uno de los que tenía que ir al sitio de los sucesos . . . habían hecho un plan para atentar contra la vida del Gobernador, y me habían escogido a mí para velar el sitio y avisarles de la policía.'' El plan era para realizarse al día siguiente, tirándole al Gobernador ''cuando saludara la bandera, a la cabeza porque traía un peto de acero puesto.'' Al día siguiente vió en efecto disparar en la parada hacia el templete, a Elifaz Escobar, López de Victoria, Segarra y otros.

Juan Bautista García Ríos, subadministrador del Hospital Tricoche manifestó que el acusado fué a procurar el cadáver de Antongiorgi para llevárselo porque tenía interés. Estuvo tres veces ese día. Al día siguiente volvió con igual propósito. Antongiorgi fué uno de los que asistió según la declaración de Pablo Quiñones a la reunión del veinte en que se acordó el plan desarrollado el veinte y cinco y de los que hizo fuego hacia el templete donde estaban el Gobernador Winship y el Coronel Irizarry. Fué muerto a consecuencia de un disparo que lo hizo allí mismo el policía Luis Modesti.

No hay contra el acusado prueba alguna de que se le viera disparar el veinte y cinco de julio, pero sí la hay de que fué uno de los cerebros propulsores del crimen, habiendo presi-·dido la reunión en que el plan a seguir para realizarlo fué acordado. Y siendo ello así, no erró la corte al apreciar la prueba como demostrativa de su culpabilidad como autor del mismo.

"Todas las personas complicadas en la comisión de un ·crimen", prescribe el artículo 36 del Código Penal, "ya fuere *felony* o *misdemeanor,* y que directamente cometieren el acto constitutivo del delito, o no hallándose presentes, hubieren aconsejado su comisión o incitado a ella; y todas las perso-nas que aconsejaren o incitaren a menores de catorce años, lunáticos o idiotas, a cometer algún crimen; o que, por me-·dio de fraude, artificio, o violencia, ocasionaren la embria-guez de otra persona, con el fin de hacerle cometer un cri-men, son principales o autores en el crimen cometido."

■■■ Que "la corte inferior cometió error por no haberse inhibido de intervenir en este caso como juez Domingo Se-púlveda cuyo prejuicio contra otros coacusados bajo esta misma acusación contra Casimiro Berenguer había sido puesto de manifiesto al felicitar en corte abierta a los jurados que habían rendido veredicto de culpabilidad contra los otros co-acusados," se sostiene en el señalamiento décimoquinto.

Examinados los autos no se encuentra en ellos nada que indique que el acusado solicitara en forma alguna la inhibi-ción del juez sentenciador.

Las causas de inhibición según las fija el artículo 23 del Código de Enjuiciamiento Civil son las siguientes:

"Un juez deberá inhibirse de actuar en cualquiera de los casos siguientes:

"1. En un pleito o procedimiento judicial de cualquier clase en que fuere parte o estuviere directa o indirectamente interesado.

"2. En todo pleito o procedimiento judicial en que el juez tuviere parentesco de consanguinidad o afinidad con cualquiera de las partes

dentro del cuarto grado, o con el abogado de cualquiera de las partes dentro del segundo grado.

"3. Cuando el juez hubiere sido abogado o consultor de cualquiera de las partes en el pleito o procedimiento pendiente ante su corte, o fiscal en una investigación o proceso criminal donde los hechos sean los mismos que en el pleito sometido a su resolución.

"Se exceptúa el caso en que el juez actúe solamente para ordenar el señalamiento de un juicio o el traslado del pleito a otro distrito, o a la orden declarándose inhibido."

Ninguna concurre en este caso y como bien dice el fiscal de esta corte en su alegato, "el hecho de que el propio acusado no solicitara oportunamente la inhibición de dicho magistrado ni el traslado de la causa milita en su contra y le impide levantar ahora por primera vez la cuestión que en su oportunidad no fué levantada; y que de haberla sido carecía de mérito y de base legal para que se resolviera a su favor."

Los motivos que aduce le eran conocidos al abogado del acusado y eso no obstante expresamente solicitó a nombre de su defendido, previo el consentimiento de éste, que se le juzgara por el tribunal de derecho presidido por el juez que ahora sostiene que debió inhibirse. No hay consistencia en su actitud.

Por el décimosexto señalamiento de error se levanta la cuestión de la nulidad de la sentencia por haberse dictado en contra de lo dispuesto en el artículo 309 del Código de Enjuiciamiento Criminal. El precepto dice:

"Después de una confesión o veredicto de culpabilidad, o después de dado un veredicto contra el acusado, en un caso en que se alegare haber sido éste anteriormente declarado convicto o absuelto, si no se suspende la sentencia o se concede un nuevo juicio, el tribunal señalará día para dictar sentencia, que, en casos de felony (delito muy grave), será cuando menos dos días después del veredicto, si el tribunal se propone continuar en sesión, mientras tanto; pero si no fuese así, entonces será en fecha tan distante como pueda razonablemente fijarse."

La mente del legislador estuvo fija en dos situaciones al decretarlo, la creada por una confesión y la que surge una

vez radicado un veredicto de culpabilidad.  Conocemos lo ocurrido.  Sabemos que la corte el 16 de enero de 1939 dictó sentencia declarando culpable al acusado y condenándolo a reclusión perpetua.  Impugnó la sentencia el acusado.  Alegó que no le dió la oportunidad de presentar sus alegaciones, y la corte, el 18 de enero, dejó sin efecto la parte dispositiva de su sentencia, esto es, resolvió que permaneciera en pie la declaración de culpabilidad contenida en la misma equivalente a la confesión o al veredicto, y fijó el 23 de enero de 1939 para dictar lo que en el caso de un veredicto o confesión sería la totalidad de la sentencia.

Quiere decir que la corte dió entonces al acusado la oportunidad para presentar sus alegaciones de la cual se aprovechó archivando su moción de nuevo juicio, y no fué hasta después de haber considerado y declarado sin lugar dicha moción, que la corte procedió a condenar definitivamente al acusado.

Siendo ése el procedimiento seguido, no habiéndose causado perjuicio alguno al acusado y habiéndose aplicado la ley en su propio espíritu, no hay base para el señalamiento de error.

Los dos últimos señalamientos se refieren a los errores que se imputan a la corte al negar el nuevo juicio y al dictar sentencia como resultado final del proceso.

Como la moción de nuevo juicio se fundó en motivos que hemos ya considerado y resuelto en sentido contrario al apelante y como la sentencia se ajusta a los hechos y a la ley, se impone la conclusión de que dichos errores tampoco fueron cometidos.

*Por virtud de todo lo expuesto debe el recurso declararse sin lugar y confirmarse la sentencia recurrida.*

El Juez Asociado Sr. Todd, Jr., no intervino.