EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN RAMÓN GONZÁLEZ, acusado y apelante.

Núm. 9544.—*Sometido:* Enero 14, 1943. *Resuelto:* Febrero 2, 1943.

*Edgar S. Belaval,* abogado del acusado; *R. A. Gómez, Fiscal del Tribunal Supremo* y *Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

El acusado, después de renunciar a un juicio por jurado, fué convicto por la corte de distrito del delito de asesinato en segundo grado y sentenciado a 30 años de presidio. Apeló y señala tres errores.

Juan Santa había estado empleado con José Ruidíaz, comerciante, durante 10 años. Ruidíaz vivía detrás de su tienda. Siempre que salía de la tienda, Santa se la cuidaba. Esta tienda estaba situada cerca de la factoría de la Loíza Sugar Company, más o menos como a 100 metros de la Central.

El día 9 de octubre de 1938, un domingo, Ruidíaz salió de su tienda como a la una de la tarde y vino a San Juan. Dejó cerradas la tienda y su casa, y Santa permaneció allí para cuidarla hasta que Ruidíaz regresara. Cuando éste regresó como a las 11:00 u 11:30 de la noche, encontró a Santa tendido sobre el suelo, al parecer muerto. Las cerraduras de la puerta de atrás de la tienda y de su ropero habían sido descerrajadas, y se habían desaparecido del ropero aproximadamente $270. Quedó establecido que Santa recibió cuatro diferentes heridas, y que había muerto a consecuencias de una fractura del cráneo como a las 8:15 ó 9:15.

El fiscal de distrito radicó una sola acusación contra Juan Ramón González, José Alberto Muriel y Mariano Rosario Centeno, acusándolos conjuntamente del asesinato de Santa, pero a González se le celebró juicio por separado en el caso que ahora está ante nos en apelación.

González vivía en los Cuarteles de la Loíza Sugar Company, situados cerca de la escena del crimen. Félix Santiago declaró que en la noche del suceso de sangre, que era una clara y de luna, llevaba una vaca por frente de la tienda de Ruidíaz como de 7:30 a 8:00 de la noche; que vió al acusado y a Mariano Rosario Centeno empuñando a Santa; y que vió a Muriel, que se encontraba a poca distancia de allí,

doblado como queriendo agarrar algo del suelo, y mirando hacia donde estaba Santa.

Dos testigos declararon que como a las 7:30 vieron a Muriel, quien les preguntó dónde se encontraba González, y que Muriel le pidió a uno de los testigos que lo llevara a los Cuarteles de la Central, y que si le encontraba a González le daría un premio. Otro testigo declaró que como a las 7:00 p.m. esa misma noche, Muriel le preguntó por el paradero de González; que le dijo a Muriel que no sabía; que unos minutos más tarde vió a González y le dijo que Muriel lo andaba buscando y que le informó a Muriel de esto cuando lo vió por segunda vez.

Los coacusados Muriel y Mariano Rosario Centeno vivían juntos en los Cuarteles de la Central. Un chófer público que trabajaba en la ruta entre Canóvanas y la Central, viaje que solamente duraba cinco minutos, declaró que llevó a González y a Muriel del pueblo a la Central entre 8:00 y 9:00 de la noche en que ocurrió el suceso de sangre. Otro testigo declaró que vió al acusado entre 8:00 y 9:00 de aquella misma noche, corriendo de la dirección en que se encontraba la casa de Ruidíaz, y que entonces tomó un automóvil que iba hacia Canóvanas. Un policía declaró que como a medianoche encontró al acusado en el batey de la Central, en cuclillas, comiéndose una toronja; y que cuando oyó que Santa había aparecido muerto, se le cayó la toronja y le dijo al policía que un hombre llamado Muriel, un individuo peligroso, había estado buscándolo esa noche.

Aun cuando la prueba no fué lo robusta que pudo haber sido, hubo suficiente evidencia directa y circunstancial para justificar la convicción del acusado. La corte de distrito, al rehusar dar crédito al testimonio del acusado, mediante el cual trató de establecer una coartada, actuó dentro de su competencia. *Pueblo v. Berenguer*, 59 D.P.R. 81, 92.

■ No hubo error al admitir como prueba en contra del acusado los actos y manifestaciones de Muriel, su coacusado,

en relación con los esfuerzos de Muriel por localizar al acusado la noche del crimen, toda vez que la acusación imputaba al acusado, a Muriel y a otra persona la comisión del crimen en cuestión conjuntamente. *Pueblo* v. *Escobar,* 55 D.P.R. 505, 523; *Pueblo* v. *Berenguer,* supra, a la página 90.

El acusado se opuso durante el juicio a la introducción de este testimonio por el fundamento de que no podía admitirse a menos que se demostrara primeramente la conexión de Muriel con el asesinato. Como cuestión de derecho no existe tal requisito. "El orden lógico de los sucesos—desde el acuerdo sobre un propósito común hasta la perpetración de un acto concebido para llevarlo a cabo—no exige que la presentación de la evidencia siga el mismo estricto orden." (*McDonald* v. *United States,* ____Fed. (2d)____, ____ (C. A., D. C. 1942.) "Generalmente, el orden en que deba presentarse la evidencia a un jurado está controlado por el juez que está presidiendo el caso. Si recibe evidencia fuera de su orden lógico, podría hacerse necesario más tarde que él la elimine del récord e instruir al jurado que haga caso omiso de ella; o quizá declarar un *mistrial.* Pero si El Pueblo presenta suficiente evidencia, antes de cerrar su caso, para demostrar la relevancia, materialidad u otro factor de admisibilidad de la evidencia impugnada, entonces no surge perjuicio contra el acusado." (*Ercoli* v. *United States,* ____ F. (2d)____, ____(C. A., D. C. 1942).)

Como cuestión de hecho, en este caso específico, Muriel ya había sido conectado con el crimen por la declaración de Santiago arriba mencionada, antes de que los actos y declaraciones de Muriel fueran ofrecidos en evidencia contra el acusado.

■ Finalmente, el acusado se queja de la actuación del juez que vió el caso, el cual, a iniciativa propia, llamó dos testigos para que declarasen después que ambas partes habían terminado su caso. Sólo uno de estos testigos en realidad declaró. Al resolver la moción para que se eliminara su testimonio, la corte inferior dijo:

"La Corte entiende que tiene la facultad de citar a cualquier testigo cuya declaración la Corte crea puede ayudarla a resolver un caso. En este caso la declaración de Félix Santiago es una declaración esencial y es importantísimo para la Corte determinar si Santiago dijo o no la verdad. La propia declaración de Santiago dejaba una laguna que la Corte no acertaba a comprender, y es cómo se averiguó que Santiago sabía algo. La Corte estaba preocupada por eso y creyó conveniente citar a la persona que según la prueba había ordenado el arresto de Santiago a ver por qué fué que se arrestó a Santiago; cómo se llegó a saber que Santiago sabía algo de este caso, . . . . La Corte llamó al testigo que no había sido presentado por ninguna de las partes para que aclarara esa situación y no es refutación de la prueba de defensa ni es prueba de El Pueblo ni de la Defensa: es sencillamente una prueba que aclara una situación."

La resolución de la corte no solamente fué correcta en grado sumo, sino que su actuación al insistir en oír al juez de paz que ordenó el arresto del testigo fué digna de encomio. Después que se les concede a las partes amplia oportunidad de presentar todos los hechos y éstas no lo hacen, un juez de distrito está justificado en llamar *sua sponte* a testigos que pueden arrojar luz sobre cualquiera de los hechos materiales en controversia. (Véase *Pueblo* v. *Alvarado,* 55 D.P.R. 26, 29; *Pueblo* v. *Quiles,* 41 D.P.R. 915, 921; Anotación en 84 A.L.R. 1172). La declaración del juez de paz aclaró la cuestión de cómo se descubrió que Santiago sabía algo acerca de los hechos de este caso y por qué no había declarado—"porque le tenía miedo" al acusado—el primer día de la investigación.

*La sentencia de la corte de distrito será confirmada.*