EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* LUCAS E. CASTRO ANGUITA, acusado y apelante.

Número 15146.

*Sometido:* 26 de agosto de 1952. *Resuelto:* 30 de diciembre de 1953.

R. *Rivera Zayas, Sergio G. Gelpí, Félix Ochoteco, Jr. y Benicio Sánchez Castaño,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge (Víctor Gutiérrez Franqui, Exprocurador General,* en el alegato) y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del tribunal.

Lucas E. Castro Anguita, el aquí apelante, fué acusado conjuntamente con Miguel Angel Palóu y con Miguel Cirilo Batalla en el anterior tribunal de distrito de ocho delitos de asesinato en primer grado y de dos delitos de atentado a la vida. Las ocho acusaciones de asesinato así como las dos de atentado a la vida son idénticas, con excepción de los nombres de las víctimas. A solicitud de Castro, el tribunal sentenciador ordenó que se le juzgase por separado con respecto a los diez casos, los cuales por estipulación de las partes fueron vistos conjuntamente. Los casos se vieron ante un jurado resultando Castro convicto de todos los delitos imputádosle. La corte sentenciadora le impuso una sentencia de reclusión perpetua en cada caso de asesinato y de uno a diez años en cada caso de atentado a la vida. Contra las diez sentencias Castro ha interpuesto recurso de apelación, señalando la comisión de once errores.

██ El primer error señalado es que las acusaciones "no contienen elementos suficientes en derecho para constituir los delitos de asesinato en primer grado y de atentado a la vida imputados en las mismas." El acusado esgrime el mismo argumento en cuanto a ambas clases de acusaciones. En su consecuencia, para disponer de este error, sólo tenemos que discutir las acusaciones de asesinato.

Cada acusación de asesinato imputa al acusado que ". . . ilegal, volutaria y criminalmente, con malicia premeditada, deliberación, con intención y propósito decidido y firme de matar, demostrando tener corazones pervertidos y malignos, actuando los tres acusados de común acuerdo entre sí, dieron muerte ilegal al ser humano [nombre de la víctima] al perpetrar dichos acusados un Incendio Malicioso en Primer Grado, en el edificio habitado, de tres pisos [descripción del edificio] ocupado allí y entonces por seres humanos en dos de sus pisos y en el otro por los Almacenes Palóu de la firma comercial Miguel A. Palóu y Cía., S. en C., habiéndose preconcebido y planeado dicho incendio por los tres acusados entre sí . . ."

Las acusaciones se basan en los artículos 199, 201 y 398 del Código Penal, ed. 1937.(¹) Aquí se imputa asesinato en primer grado ya que, según dispone el artículo 201, se cometió "al perpetrarse o intentarse algún incendio de morada . . ." Véase *El Pueblo* v. *Alméstica*, 18 D.P.R. 320. El apelante sostiene que las acusaciones son defectuosas porque no alegan que al perpetrar el incendio de morada los acusados lo hicieron con la intención de destruir el edificio.

---

(¹) El artículo 199 dispone que "Asesinato es dar muerte ilegal, a un ser humano, con malicia y premeditación."

El artículo 201 lee como sigue: "Todo asesinato perpetrado por medio de veneno, acecho, o tortura, y toda clase de muerte alevosa, deliberada y premeditada, o cometida al perpetrarse o intentarse algún incendio de morada, rapto, robo, asalto, o mutilación, constituye asesinato de primer grado; siendo de segundo grado todos los demás."

El artículo 398 lee como sigue: "Constituye incendio malicioso el acto voluntario de pegar fuego a un edificio ajeno con intención de destruirlo."

Existen casos que sostienen que una acusación de incendio malicioso debe alegar que éste se perpetró con la intención de destruir el edificio. 3 Burdick, *The Law of Crime*, págs. 7–8; 3 Cal. Jur. sec. 7, pág. 167; *People* v. *Mooney*, 59 Pac. 761 (Cal., 1889). Presumimos que aplicaríamos la misma doctrina en esta jurisdicción. *Cf. Pueblo* v. *Pérez*, 35 D.P.R. 1038. Pero la presente es una acusación de asesinato en primer grado y no de incendio malicioso. Y no se nos ha citado caso alguno que resuelva que una acusación de asesinato en primer grado basada en la muerte de una persona al perpetrarse un incendio de morada deba alegar que éste fué cometido con la intención de destruir el edificio.

El acusado descansa en el historial que en los Estados Unidos han tenido estatutos similares a los artículos 201 y 398. Sin embargo, nada encontramos en dicho historial que nos exija convenir con el acusado en este punto. 2 Burdick, supra, págs. 178–80. No podemos ver por qué el hecho de que el concepto del derecho común de incendio malicioso haya sido cambiado un poco por varios estatutos—*cf.* artículos 403, 405 y 407 del Código Penal—haga necesario alegar el delito envuelto en este caso en el lenguaje del artículo 398. El delito aquí imputado no es incendio malicioso bajo el artículo 398. Es asesinato en primer grado bajo el artículo 201. Y la acusación no solamente imputa un delito en el lenguaje de este último, si que también contiene los hechos específicos que constituyen el delito. Por tanto creemos que la acusación expone un delito bajo el artículo 201 y que el primer error no fué cometido. Véanse *El Pueblo* v. *Calero et al.,* 18 D.P.R. 44; *El Pueblo* v. *Matos y Matos,* 26 D.P.R. 586; *People* v. *Burns,* 63 Cal. 614 (1883) ; *People* v. *Green,* 223 Pac. 1004 (Cal., 1924) ; *United States* v. *Debrow,* 346 U. S. 374.

██ Pasemos a los errores octavo y noveno, que ambas partes discuten conjuntamente. En el octavo error Castro se queja de la admisión en evidencia de prueba relativa a las condiciones físicas y a la huída de Batalla con posterioridad

a la consumación del alegado designio común de los tres acusados de pegar fuego. En el noveno error Castro sostiene que el tribunal sentenciador cometió error al instruir al jurado—obviamente refiriéndose a la huída de Batalla después de cometido el delito—al efecto de que "la huída de una persona inmediatamente después de la comisión de un crimen, o después de haber realizado el crimen de que se le acusa es una circunstancia que puede ser considerada por el jurado como demostrativa de una conciencia no exenta de culpabilidad, aunque la corte instruye al jurado de que ella no es por sí solo suficiente para establecer la culpabilidad del acusado."

Estos errores deben considerarse a la luz de las circunstancias de este caso. A nuestros fines es innecesario sintetizar el voluminoso récord del testimonio presentado durante el juicio. Basta decir que hubo evidencia de la cual el jurado podía llegar a las conclusiones expuestas en los próximos cinco párrafos.

En el almacén de Palóu & Cía., antes del amanecer del día 15 de diciembre de 1949, ocurrió un incendio intencional. Ya entrada la tarde del día 14, Palóu y Batalla le tomaron prestado un automóvil a un amigo para una supuesta aventura con dos amigas. Inmediatamente antes de que el fuego comenzara, Palóu pasó con dicho automóvil muy despacio, miró de arriba a abajo, y luego se detuvo aproximadamente a 30 pies más abajo de los Almacenes Palóu. Minuto y medio después se oyó una tremenda explosión, comenzando un fuego que resultó en la muerte de varias personas y en quemaduras o leriones de otras. Cuando ocurrió la explosión ni Batalla ni Palóu estaban en su apartamiento.

Palóu era el socio gestor de la firma Palóu & Cía. Castro era socio comanditario y acreedor de la firma en las sumas de $6,000 y $19,413.67, respectivamente. La firma tenía una póliza de seguros de $40,000 sobre sus existencias. La póliza había sido renovada el 9 de septiembre de 1949, tres meses antes del fuego. Castro obtuvo de la compañía de seguros, con el consentimiento de Palóu, un endoso de la póliza, el cual

establecía una preferencia a favor del primero. Castro le dijo al agente de seguros cuando se renovó la póliza que él le hablaría a Palóu para que aumentara la póliza en la suma de $15,000, a fin de que ésta cubriera un futuro embarque de mercancía. La firma, establecida en 1944, había ganado dinero en sus primeros años, pero desde 1946 hasta el 14 de diciembre de 1949, perdió $18,309.65. El día del fuego el pasivo de la firma era de $72,412.13, mientras que el activo solamente ascendía a $69,326.05.

El contador que llevaba los libros para la firma vió a Castro en los Almacenes Palóu en dos o tres ocasiones. Palóu había mandado a buscar el contador el 17 de octubre de 1949 y más tarde llegó Castro. En presencia de Castro, se examinaron algunas cuentas que habían sido recibidas de Nueva York y Palóu y el contador discutieron la situación del negocio.

Palóu estaba casado con una sobrina política de Castro. Batalla, un cubano, vivía en el apartamiento de Palóu y pasaba como cuñado de éste. Castro venía algunas veces a los Almacenes Palóu. Palóu, Castro y Batalla fueron vistos hablando en un pasillo detrás del almacén en cierta ocasión antes del fuego.

El chófer de la firma llevó a Palóu en un automóvil propiedad de la firma a la casa de Castro durante la mañana del 14 de diciembre de 1949. Luego, por la tarde en el mismo automóvil, el chófer llevó a Palóu y a Batalla a un garaje. El chófer se fué para su casa, por indicación de Palóu, dejándole a éste el automóvil del negocio. Nadie ha informado a la compañía de seguros del fuego ni ha hecho reclamación alguna en cobro del seguro. El 14 de diciembre de 1949 a las diez de la noche, Batalla no tenía ni quemaduras ni lesiones.

En lo que respecta a Castro, lo anteriormente expuesto demuestra a lo sumo motivo y oportunidad de planear el delito con los otros acusados. Batalla había confesado anteriormente su participación en pegar el fuego y había complicado tanto a Castro como a Palóu. *Castro* v. *González, Alcaide*

*de Cárcel*, 70 D.P.R. 887. Pero dicha confesión no está en autos. Fué hecha después del arresto de Batalla y, en lo que a éste respecta, luego de consumada la conspiración o designio común. Era claramente inadmisible en contra de Castro; en verdad, el Pueblo no hizo esfuerzo alguno para presentarla en evidencia. (²) Además, en el juicio de este caso Batalla se negó a declarar por el fundamento de que su caso estaba pendiente en este Tribunal y su testimonio lo podría incriminar. *Batalla* v. *Tribunal de Distrito*, 74 D.P.R. 289. Por consiguiente, el caso contra Castro hubiera sido legalmente insuficiente si el Estado Libre Asociado no hubiera presentado otro testigo.

Rosalí Miranda Colón, un agente vendedor de la firma de Palóu & Cía., declaró que el día después del fuego, el 16 de diciembre de 1949, a las 7 de la mañana, él fué a la casa de Castro porque necesitaba algún dinero para hacer unas compras y quería, como empleado de Castro, pedirle a éste algún dinero adelantado para pagarlo cuando la firma volviera a abrir el negocio. Castro le invitó a su oficina, en un garaje detrás de la casa, donde el testigo le pidió $40 que Castro le dió. En ese momento Castro le dijo que "se sentía apenado por la desgracia que había habido en los Almacenes Palóu" porque él, Batalla y Palóu "no pensaban en que al haber el fuego irían a ocurrir tantas muertes." Castro también le dijo que Batalla y Palóu habían venido a su casa algunas semanas antes del fuego a conferenciar con Castro "sobre la manera y tiempo que se iba a efectuar el incendio" en los Almacenes Palóu, en la Calle Allen núm. 300. Castro también añadió que Batalla "no estaba de acuerdo . . . al asunto del fuego"; que Batalla "estaba completamente acobardado"; que entonces Castro le dijo, "Pero Miguel deja a ese hombre si no quiere hacer eso"; entonces según Castro, Palóu se levantó brúscamente y se fué; y que Batalla entonces se despidió de Castro y se fué también.

---

(²) Más adelante en esta opinión citamos los casos que resuelven que tal confesión de Batalla sería inadmisible contra Castro.

Siguió testificando Rosalí Miranda que Castro le había preguntado si había declarado ante los fiscales. Contestó que había declarado en cuanto a "algunas cosas". Castro entonces le dijo que si lo llamaban a declarar de nuevo, "que tuviera mucho cuidado con lo que yo iba a declarar cosa que no lo fuera a envolver en el fuego" y que "cualquier cosa que se me ofreciera podía contar con la cooperación de él y que en cualquier momento podría ir a su casa". Su conversación duró como quince minutos. El testigo volvió a casa de Castro el 26 de diciembre de 1949 en busca de más dinero y obtuvo $30.

La declaración de Rosalí Miranda es fuertemente atacada en el alegato del acusado como increíble. Además, el acusado señala lo siguiente: (1) el testigo no mencionó estas conversaciones con Castro en una declaración jurada anterior prestada ante el fiscal; (2) su testimonio contiene algunas contradicciones; y (3) Miranda declaró sobre una supuesta llamada telefónica que Castro hizo de la oficina-garaje a fin de conseguirle un dinero al testigo en su segunda visita, y no obstante se probó inequívocamente que en dicho garaje no hay teléfono, aun cuando hay uno en la casa. Sin embargo, no compartimos el criterio del acusado de que bajo todas las circunstancias de este caso, venimos obligados a rechazar totalmente el testimonio de Rosalí Miranda en cuanto a las manifestaciones incriminatorias héchasle por Castro.

Con esta relación de los hechos que son pertinentes a las cuestiones ante nos, procederemos a discutir los errores octavo y noveno.

Las actuaciones y las manifestaciones extrajudiciales de coconspiradores—o de coacusados que cometen un delito con un designio común—son admisibles en evidencia contra los otros acusados, siempre y cuando que (1) de los autos surja alguna evidencia independiente que conecte a éstos con la conspiración o el designio común, y (2) las actuaciones y las manifestaciones de los coconspiradores hayan ocurrido durante el curso y en ayuda de la conspiración. *Pueblo* v. *González,* 61 D.P.R. 347; *Pueblo* v. *Berenguer,* 59 D.P.R. 81; *Pueblo* v.

*López Solano y Sierra*, 42 D.P.R. 504; *El Pueblo* v. *Díaz et al.*, 22 D.P.R. 191; *El Pueblo* v. *Beltrán et al.*, 18 D.P.R. 944; *Schine Theatres* v. *United States*, 334 U. S. 110, 117; *Glasser* v. *United States*, 315 U. S. 60, 74; *State* v. *Carbone*, 91 A.2d 571 (N. J., 1952); *United States* v. *Konovsky*, 202 F.2d 721, 727 (C. A. 7, 1953); Anotación, 93 L. ed. 802; IV Wigmore, *Evidence*, 3ra. ed., págs. 127–131.([3])

Como hemos aceptado, a los fines de esta opinión, el testimonio de Rosalí Miranda, resolvemos que éste era suficiente para cumplir con el primer requisito. Sin embargo, queda la cuestión en cuanto a si el testimonio de que se queja el octavo error también cumple con la segunda condición. El testimonio de que se trata fué el siguiente: un agricultor declaró que durante la mañana del 18 de diciembre de 1949 él vió a Batalla caminando por la carretera cerca de Sabana Grande y así se lo avisó a la policía, la cual arrestó a Batalla después. Identificó en detalle la ropa que Batalla tenía puesta ese día y un destornillador y alguna penicilina a medio usar que Batalla llevaba consigo. También declaró que Batalla tenía un arañazo en la cara, su oreja derecha estaba quemada, parte de su piel estaba chamuscada, y su mano y tobillo derechos estaban lacerados. Un policía corroboró el testimonio del agricultor. Un médico declaró que había examinado a Batalla el 18 de diciembre de 1949; que Batalla estaba barbudo y tenía quemaduras de segundo grado y rasguños en varias partes del cuerpo, incluyendo las manos; y que había depilación completa de los vellos. Declaró que ésta pérdida de los vellos era el resultado de una alta temperatura ocasionada por un fuego; que las quemaduras y rasguños que observó en Batalla

---

([3]) Según Muñoz Amato, *The Hearsay Rule and its Exceptions in the Law of Puerto Rico*, 32 Calif. L. Rev. 31, 47 (versión en inglés), XIII Rev. Jur. de la U.P.R. 13, 32 (versión en español), nuestros casos de hecho permiten la introducción en evidencia de declaraciones extrajudiciales sobre conspiraciones y no requieren que tales declaraciones se hagan para ayudar a la conspiración. En relación con este punto, véanse Morgan, *The Rationale of Vicarious Admissions*, 42 Harv. L. Rev. 461, 464–6; *American Law Institute, Model Code of Evidence*, Regla 508(*b*), págs. 249–51.

el 18 de diciembre habían sido causados no más de cinco ni menos de tres días con anterioridad al examen; y que Batalla no se había afeitado durante tres o cuatro días. Todo este testimonio fué admitido con la oposición de Castro al efecto de que el mismo envolvía actuaciones de Batalla con posterioridad a la comisión del delito.

Una vez que Rosalí Miranda había conectado a Castro con los delitos que se le imputan, el tribunal sentenciador actuó correctamente al resolver que el testimonio en cuanto a la condición física en que se encontró a Batalla, tres días después del fuego, era admisible en evidencia contra Castro. Esto es así porque dicho testimonio tendía a probar que Batalla había recibido quemaduras y lesiones en el sitio del fuego. Y evidencia de que un coacusado recibió lesiones mientras ayudaba en un designio común es admisible en evidencia contra los otros demandados. *Lutwak* v. *United States*, 344 U. S. 604, 618; *Fitzpatrick* v. *United States*, 178 U. S. 304, 312–13; *Shelton* v. *State*, 126 So. 390, 394 (Miss., 1930); *Lancaster* v. *State*, 106 So. 609, 615 (Ala. 1925).

 Si la evidencia de que se queja el octavo error se hubiera limitado a demostrar las quemaduras y lesiones de Batalla bajo la teoría de que éste las recibió al pegar el fuego, no encontraríamos error en su admisión. Pero el testimonio también demostró que Batalla estaba pobremente vestido, desarreglado, no se había afeitado por lo menos durante tres días, se estaba tratando con penicilina, y caminaba por la carretera cerca de Sabana Grande. El propósito de esta parte del testimonio aparentemente fué demostrar que Batalla había huído después de cometer el delito. Ciertamente así lo entendió el tribunal sentenciador: éste instruyó al jurado en efecto que la huída de Batalla era evidencia de su culpabilidad que a su vez el jurado podía tomar en consideración al determinar la culpabilidad de Castro. En su consecuencia debemos determinar si la huída de Batalla, bajo las circunstancias que se desprenden de los autos ante nos, era admisible en evidencia contra Castro.

Una conspiración de incendio malicioso con el fin de cobrar un seguro, continúa después de quemado el edificio e incluye los esfuerzos para cobrar el seguro. Por lo tanto, las actuaciones realizadas o las manifestaciones hechas por uno de los conspiradores para cobrar el seguro serían admisibles contra sus coconspiradores. *Commonwealth* v. *Girardot*, 163 Atl. 362 (Pa., 1932); *State* v. *Bersch*, 207 S. W. 809 (Mo., 1918); *Allen* v. *Commonwealth*, 196 S. W. 160, 165 (Ky., 1917); *Rawlings* v. *State*, 136 S. E. 448 (Ga., 1927). Pero el rol de Batalla en el designio común, hasta donde surge de los autos, había terminado cuando ocurrió el fuego. Si se iba a efectuar el cobro del seguro, esa era cuestión a realizarse por Palóu y Castro, los beneficiarios. Suponemos que resolveríamos que las actuaciones o manifestaciones de Batalla sobre el designio común, aun cuando no fueran para ayudar en la conspiración, serían admisibles contra Castro. Véase el escolio 3. Sin embargo, el arresto de Batalla cerca de Sabana Grande tres días después de ocurrido el fuego, no fué una actuación, bien sea para ayudar en la conspiración o bien sobre la misma. *Cf. State* v. *Violet*, 234 N. W. 623 (S. D., 1931); *Bollenbach* v. *United States*, 326 U. S. 607.

No resolvemos que la huída—o un plan para huir—nunca pueden ser considerados como parte de una conspiración o designio común. En este mismo caso se introdujo evidencia al efecto de que el 14 de diciembre de 1949, Batalla había hecho gestiones para obtener de las autoridades de inmigración un permiso para volver a entrar en la isla, con miras a un viaje a Cuba el 20 de diciembre por diez días. Tal plan, si concebido deliberadamente como parte del designio común, sería admisible contra los coacusados. Pero aquí Batalla no llevó a efecto plan alguno para huir a Cuba. Y de los autos nada surge con respecto a cómo llegó a Sabana Grande. Sin embargo, la inferencia a que se esperaba llegara el jurado—especialmente en vista de la instrucción de que se queja el noveno error—fué que Batalla, lleno de pánico debido a sus quemaduras y a los otros sucesos imprevistos que ocurrieron

durante el fuego, por su propia iniciativa precipitadamente huyó en alguna fecha desconocida después del fuego.

De cuanto aparece en autos, Batalla no huyó inmediatamente después del fuego. La evidencia sólo demuestra que se le encontró cerca de Sabana Grande a los tres días del fuego. Durante el curso de sus instrucciones al jurado, el juez sentenciador indicó que el fiscal al exponer la teoría de su caso manifestó que "Batalla fué dejado [por Palóu] en un sitio en Santurce herido. Que éste hizo un viaje sin rumbo por la Isla hasta que fué arrestado en Sabana Grande días después." Indudablemente el fiscal tenía esperanzas de probar mediante el testimonio del propio Batalla que éste había pegado el fuego, ayudado por Palóu; que Palóu en un automóvil prestado había llevado a Batalla, quien se había quemado y lesionado al pegar el fuego, lejos del sitio en que éste ocurrió, dejándolo en Santurce; que Batalla inmediatamente huyó a la isla; y que después de ir de un pueblo a otro, Batalla fué arrestado cerca de Sabana Grande. Pero Batalla se negó a declarar. Por consiguiente en los autos nada hay, con excepción del hecho escueto de que Batalla fué arrestado tres días después del fuego bajo circunstancias indicativas de que en algún momento había huído de San Juan.

De haberse demostrado que Batalla huyó inmediatamente después del fuego, quizás esto hubiera sido un acto tan espontáneo o quizás hubiera sido un acto tan interrelacionado con la iniciación del fuego que, aun cuando continuó durante tres días, el mismo sería admisible en evidencia contra Castro. Véanse *Cline* v. *State*, 148 So. 172 (Ala. 1933); *Gribble* v. *State*, 241 S. W. 158 (Tex., 1922); Underhill, *Criminal Evidence*, 4ta. ed., pág. 1420; Anotación, 93 L. ed. 802, 803; *Acosta* v. *Crespo*, 70 D.P.R. 239, 257–8; *People* v. *Kauffman*, 92 Pac. 861 (Cal., 1907); *People* v. *Cabaltero*, 87 P.2d 364 (Cal., 1939); *Comments*, 26 So. Calif. L. Rev. 64, 75; 40 Harv. L. Rev. 651; *Notes*, 75 U. of Pa. L. Rev. 361; Miller, *Criminal Law*, 115. *Cf State* v. *Dickerson*, 127 S. E. 256 (N. C., 1925); *Pueblo* v. *López Solano y Sierra*, supra; *Pue-*

*blo* v. *Philip,* 34 D.P.R. 644; *El Pueblo* v. *Souffront,* 30 D.P.R. 105. Pero, sin la confesión o el testimonio de Batalla, de los autos surge solamente su arresto cerca de Sabana Grande tres días después del fuego. Por sí sola, esta única pieza de testimonio no trae su supuesta huída bien dentro de la regla de que fué un acto espontáneo o bien dentro de la regla de que estaba interrelacionada con el delito propiamente dicho.

La huída de un acusado, aun cuando un poco tardía, constituye evidencia tendente a demostrar culpa personal. Anotación, 25 A.L.R. 886. Pero la mera huída de un acusado, luego de cometerse un delito, desprovista de cualesquiera otras circunstancias, de ordinario no es admisible contra otro acusado. *Lance* v. *State,* 142 S. E. 105 (Ga., 1928); *People* v. *Stanley,* 47 Cal. 113 (1874); *McKenzie* v. *State,* 25 S. W. 426 (Tex., 1894); *People* v. *Sharp,* 14 N. E. 319 (N. Y., 1887); *State* v. *Weaver,* 65 S. W. 308 (Mo., 1901); Underhill, supra; II Wigmore, *Evidence,* 3ra. ed., sec. 276(4) págs. 111-6; IV id., sec. 1052, pág. 11. Tal evidencia es admisible si el segundo acusado participa en el plan para huir. II Wigmore, supra, pág. 116. Pero, como ya se ha dicho, no hay evidencia de tal participación de parte de Castro en la huída de Batalla a Sabana Grande.

Las actuaciones de un conspirador que tuvieron efecto después de consumada la conspiración, son admisibles contra los coconspiradores, si las mismas tienden a confirmar los hechos de la conspiración o demuestran la intención de los conspiradores. *Lutwak* v. *United States,* supra, 617; *United States* v. *Rubenstein,* 151 F.2d 915 (C. A. 2, 1945). Pero nada encontramos en el hecho escueto del arresto de Batalla tres días después de cometido el delito que establezca alguno de los hechos de la conspiración o la intención de los que participaron en la misma.

Existen casos estatales que resuelven que en cada conspiración criminal hay implícitamente un convenio de encubrir evidencia y de evitar ser procesado. Bajo dichos casos las actuaciones o manifestaciones de un coconspirador hechas

para tales propósitos, aun después de consumado el delito, son admisibles contra los otros acusados. *Pressley* v. *State*, 53 S. E.2d 106, 111 (Ga., 1949) ; *Cline* v. *State*, supra; *Allen* v. *Commonwealth*, supra; *People* v. *Suter*, 111 P.2d 23, 31 (Calif., 1941) ; *State* v. *Strait*, 279 S. W. 109, 114 (Mo., 1925) ; *Hooper* v. *State*, 58 S. W.2d 434 (Ark., 1933) ; *State* v. *Emory*, 226 Pac. 754 (Kans., 1924) ; *Commonwealth* v. *Smith*, 24 N. E. 677 (Mass., 1890). El Tribunal Supremo de los Estados Unidos rehusó seguir estos casos en *Krulewitch* v. *United States*, 336 U. S. 440. Es innecesario determinar en este caso qué regla adoptaríamos sobre este punto, ya que nada hay en el hecho del arresto de Batalla cerca de Sabana Grande que haga caer su conducta dentro de la regla establecida en los casos estatales. *Cf. Lutwak* v. *United States*, supra.(⁴)

■ La confesión escrita y detallada de Batalla complicando a Castro era inadmisible en evidencia contra éste, y el fiscal no hizo esfuerzo alguno por presentarla en evidencia en este caso. "Si bien la actuación de un coautor en la comisión de un delito es admisible contra los otros cuando la misma es para ayudar en la perpetración del delito, *Pinkerton* v. *United States*, 328 U. S. 640, 646–647, y casos citados, toda esa responsabilidad desaparece cuando finaliza la conspiración. *Logan* v. *United States*, 144 U. S. 263, 309; *Brown* v. *United States*, 150 U. S. 93, 98. Además, la confesión o la admisión por un coconspirador luego de ser éste arrestado, no es en forma alguna una ayuda para cometer el delito. Es más bien una frustración del mismo. . . . En tanto en cuanto concierne a cada conspirador confeso, el plan ha terminado ahí para él. Entonces ya ha cesado de actuar en el rol de conspirador. Sus admisiones, por tanto, no son admisibles

---

(⁴) Para discusiones del caso de *Krulewitch* en comparación con los casos estatales, véanse 23 So. Calif. L. Rev. 102; 35 Va. L. Rev. 643.

La opinión concurrente del Juez Jackson en el caso de *Krulewitch* describe los peligros que se vislumbran en una acusación de conspiración y las reglas de evidencia bajo la misma. Sobre esta misma cuestión, véanse *Notes*, 62 Harv. L. Rev. 276; 56 Yale L. J. 371.

contra sus antiguos coconspiradores. *Gambino* v. *United States*, 108 F.2d 140, 142-143." *Fiswick* v. *United States*, 329 U. S. 211, 217; *Pueblo* v. *Colón*, 52 D.P.R. 413; *Pueblo v. Coto (a) Yoyo*, 48 D.P.R. 147; *United States* v. *Hall*, 178 F.2d 853 (C. A. 2, 1950); *State* v. *Violet*, supra; *State* v. *Frisby*, 204 S. W. 3 (Mo., 1918); IV Wigmore, supra, págs. 116-7; Anotación, 93 L. ed. 802. En lo que respecta a los autos ante nos, la huída de Batalla a lo sumo era conducta posterior al delito que era equivalente a una confesión general implícita de su culpabilidad personal. La confesión escrita de Batalla complicando a Castro era inadmisible contra éste. De esto surge claramente que la conducta de Batalla equivalente a una confesión es igualmente inadmisible contra Castro.

El noveno error, en el cual Castro se queja de la instrucción dada al jurado en cuanto a la huída de Batalla, debe examinarse a la luz del octavo. Como hemos visto, el testimonio en relación con las quemaduras y lesiones de Batalla al momento de su arresto era admisible contra Castro. En su consecuencia, la admisión del testimonio adicional al efecto de que Batalla fué encontrado bajo circunstancias que demostraban que había huído, pudo por sí sola no ser perjudicial. En verdad, concebiblemente podría considerarse como necesariamente inseparable del testimonio en cuanto a las condiciones en que estaba Batalla cuando se le arrestó, haciendo admisible todo el testimonio como una sola unidad. Véase *Acosta* v. *Crespo*, supra, pág. 257. Pero el error no fué tanto en la admisión de esta evidencia algo inconclusa con respecto a la huída, sino más bien en la instrucción al jurado al efecto de que la huída de Batalla podía considerarse como evidencia de la culpabilidad de Castro.

Como ya hemos indicado, no existe duda alguna en cuanto a la doctrina de que la huída constituye alguna evidencia de la culpabilidad personal y que un tribunal sentenciador debe así instruir al jurado. También, como hemos visto, la huída de un conspirador es admisible contra sus coconspiradores si (1) es parte del designio común, (2) es una actuación espon-

tánea inmediatamente después de cometido el delito, (3) es una actuación interrelacionada con el delito, o (4) confirma los hechos de la conspiración o demuestra la intención de las partes. Pero en ausencia de todos estos cuatro factores, constituye error instruir a un jurado sobre que la huída de un acusado es evidencia de la culpabilidad de otro. Como ya se ha indicado, esto es igual a la errónea instrucción de que una confesión extrajudicial luego de cometido el delito, de parte de un acusado, constituye evidencia contra el otro acusado.

Los abogados de Castro no se opusieron específicamente a la instrucción de que ahora se quejan en el noveno error.[5] Sin embargo, objetaron vigorosamenté y en detalle la admisión en evidencia de la huída de Batalla y su condición física y apariencia cuando se le arrestó. Aun cuando no se objetó específicamente, la instrucción en cuanto a la huída agravó el error al admitirse el testimonio en cuestión a tal extremo, que la regla ordinaria de que debe llamarse la atención de la corte hacia instrucciones supuestamente erróneas, no es de aplicación aquí. *Pueblo* v. *Belardo*, 50 D.P.R. 512; *Pueblo* v. *Agosto*, 50 D.P.R. 462; *Pueblo* v. *Serrano*, 35 D.P.R. 335; *Pueblo* v. *Sanjurjo*, 73 D.P.R. 574.[6]

De haber sido la otra evidencia en autos suficientemente fuerte para complicar a Castro, quizás hubiéramos resuelto

[5] Cuando el tribunal sentenciador terminó sus instrucciones al jurado, uno de los abogados del acusado anotó "una excepción general a todas las instrucciones y especialmente a la que se refiere al incendio malicioso y a los veredictos que podrán rendirse en estos casos."

[6] El Fiscal de este Tribunal comprendió la importancia de inyectar la huída de Batalla en el caso contra Castro. Al discutir la contención de Castro de que no se había establecido el *corpus delicti*, dice lo siguiente en su alegato: "Una circunstancia elocuente, demostrativa de que intervino la mano criminal de una persona en la ocurrencia del incendio, es el hecho de que Miguel Cirilo Batalla, quien pasaba por cuñado de Miguel Palóu y vivió en su casa, y quien hizo gestiones para salir de Puerto Rico pocos días después de ocurrido el fuego y quien acompañó a Palóu a conseguir el automóvil Oldsmobile 3376 los días 13 y 14 de diciémbre . . . apareció tres días después del fuego en un pueblo lejano de San Juan, completamente estropeado, barbudo, con numerosas quemaduras y la ropa desaliñada, contrario a como anteriormente se le veía, llevando consigo un saco conteniendo, entre otras cosas, ropa, un destornillador y un tubo de penicilina."

que los errores octavo y noveno no fueron perjudiciales. Pero, aparte del testimonio que estableció el motivo y la oportunidad de Castro, la única evidencia que conectó a Castro con el designio común que aquí se alega, es el testimonio de Rosalí Miranda en cuanto a las manifestaciones incriminatorias que Castro le hizo a él. Si bien no estamos en libertad de rechazar el testimonio de Miranda como inherentemente increíble, no podemos decir que el mismo presenta un caso tan fuerte contra Castro que excluya la posibilidad de que los errores octavo y noveno fueron perjudiciales. Como dijo el Tribunal Supremo en *Krulewitch* v. *United States*, supra, pág. 445, el error es perjudicial "si al considerarse los autos la corte tiene serias dudas en cuanto a si el error influyó sustancialmente en el veredicto." Al mismo efecto, *Fiswick* v. *United States*, supra, pág. 218; *Kotteakos* v. *United States*, 328 U. S. 750, 764–5; *Glasser* v. *United States*, supra, pág. 67; *Pueblo* v. *Coto (a) Yoyo*, supra; *Pueblo* v. *Colón*, supra, pág. 437; *El Pueblo* v. *Vázquez*, 20 D.P.R. 361, 369. Como en el caso de *Krulewitch*, no podemos decir que bajo las circunstancias de este caso, la evidencia de la huída de Batalla, unida a la instrucción de que podía ser considerada como evidencia de la culpabilidad de Castro, "no puede haber sido la pesa que inclinó la balanza contra" Castro.

Dijimos en la primera oración de nuestra opinión en el caso de *Batalla* v. *Tribunal de Distrito*, supra: "Este caso tiene su origen en actos de abominable criminalidad que una sociedad ofendida tiene que repudiar con justificado espíritu de indignación colectiva." Pero en la siguiente añadimos: "Están aquí envueltos, sin embargo, derechos fundamentales del hombre, que se alegan violados en las garantías básicas establecidas por las leyes que los reconocen y en cuya protección descansa la grandeza incomparable de la democracia en los pueblos libres del mundo." Es tan importante que los juicios de los acusados a quienes se les imputan crímenes horrendos se conduzcan libres de errores perjudiciales, como importante es que los verdaderos culpables sean eventualmente

convictos y castigados. Creemos, bajo todas las circunstancias envueltas, que para los mejores intereses de la justicia debe concederse a Castro un nuevo juicio en estos casos.

El acusado ha señalado varios otros errores. Creemos innecesario discutirlos, excepto para decir que los hemos examinado y encontramos que ninguno de ellos requiere su absolución.

*Por los motivos expuestos, las sentencias serán revocadas y se devolverán los casos para un nuevo juicio.*

El Juez Asociado Sr. Ortiz no intervino.

---

Opinión disidente del JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ.

No me son desconocidos, y ahora ratifico, el lenguaje y los conceptos que, citando del caso de *Batalla* v. *Tribunal de Distrito*, 74 D.P.R. 289, incluye el Tribunal al final de su opinión en este caso. Lo erróneo de la premisa que aquí sirve de base al Tribunal para la revocación de las sentencias—no obstante exponer correctamente la ley a otros respectos—deja sin fondo adecuado la teoría legal de dicha revocación. La premisa errónea a que me refiero es la de que la conspiración entre Castro, Palóu y Batalla, en lo que a este último concierne, terminó con el fuego.

No obstante resolver el Tribunal que la evidencia sobre la condición física de Batalla tres días después del fuego, relativa a quemaduras y lesiones, era admisible porque "tendía a probar que Batalla había recibido [tales] quemaduras y lesiones en el sitio del fuego", se llega a la conclusión de que no era admisible el testimonio al efecto de que Batalla "estaba pobremente vestido, desarreglado, no se había afeitado por lo menos durante tres días, se trataba con penicilina y caminaba por la carretera cerca de Sabana Grande", toda vez que "esta parte del testimonio aparentemente fué para demostrar que Batalla había huído después de cometer el delito", y "el rol de Batalla en el designio común, hasta donde surge de los autos, había terminado cuando ocurrió el fuego"; que "si se iba a

efectuar el cobro del seguro, eso era cuestión a realizarse por Palóu y Castro, los beneficiarios" y que "el arresto de Batalla cerca de Sabana Grande tres días después de ocurrido el fuego, no fué una actuación, bien sea para ayudar en la conspiración o bien sobre la misma."

Ninguno de los casos citados por el Tribunal para sostener tales conclusiones, incluyendo el de *Krulewitch* v. *United States*, 336 U. S. 440, 93 L. ed. 790, tienen sitio de aplicación aquí, sencillamente porque el objetivo de la conspiración en este caso no terminó con el fuego. El plan común fué concebido para defraudar a la compañía de seguros mediante la destrucción, por incendio, de las existencias aseguradas. El incendio era el medio para llegar al fin. El objetivo de la conspiración no se lograba con el fuego solamente. Era necesario que el carácter intencional del fuego se mantuviera oculto. No hay regla alguna de derecho ni autoridad jurisprudencial alguna que conceda o autorice protección a un coconspirador contra declaraciones o actuaciones de otro coconspirador cuando aún el objetivo del designio común está en marcha, aun cuando pueda fracasar. No me refiero a la confesión de Batalla ante el Fiscal, que no fué presentada en evidencia ni está envuelta en este caso. Me refiero a la evidencia que el Tribunal declara inadmisible, al efecto de que Batalla, al momento de su arresto, "estaba pobremente vestido, desarreglado, no se había afeitado por lo menos durante tres días, se trataba con penicilina y caminaba por la carretera cerca de Sabana Grande", la cual tendía a demostrar la huída de Batalla del sitio del fuego. A mi juicio, ésa era evidencia admisible, pues Batalla, hasta ese momento, no era "conspirador confeso". Él sabía que el objetivo de la conspiración no era ocasionar muertes por medio de incendio, ni destruir el edificio en sí. Era defraudar a la compañía de seguros mediante la destrucción de las existencias aseguradas por medio de un fuego que apareciera casual. Y en recto derecho, su rol de conspirador ciertamente no había terminado con el fuego. Su huída del sitio y su ocultación—sin que tuviera

ello que estar previamente acordado entre él, Palóu y Castro—tendía a evitar, o por lo menos a retardar, que se descubriera el carácter intencional del fuego, y por lo tanto permitía que Palóu y Castro, si no se descubría por otros medios, lograran, o hicieran ulteriores gestiones para lograr, su objetivo final, que era cobrar el seguro fraudulentamente.

El Tribunal correctamente expone la regla de que una conspiración de incendio con el fin de cobrar un seguro continúa aún después del incendio e incluye las gestiones hasta cobrar el seguro, véase *State* v. *Bersch*, 207 S.W. 809, o hasta que, descubierto el carácter intencional del fuego, la misma fracasa. Por lo tanto, Batalla continuaba en su carácter de coconspirador sin que obstara para ello el hecho de haber realizado la parte que en la conspiración le correspondía: pegar el fuego. El carácter y efectos de una conspiración no deben juzgarse desmembrando ésta y examinándola por partes o etapas. Debe mirarse a ella en toda su integridad. *United States* v. *Patten*, 226 U. S. 525, 57 L. ed. 333. Batalla no perdía su carácter de conspirador por el hecho de llevar a cabo su parte en la conspiración, si ésta en su objetivo final aún no había terminado. Castro, como coconspirador, era responsable de todo lo hecho por Batalla para la ejecución del designio común y de todo acto que surgiera incidentalmente como una de las consecuencias probables y naturales de dicha ejecución, aun cuando tales consecuencias no se anticiparan como parte del plan original. *Boyd* v. *United States*, 142 U. S. 450, 35 L. ed. 1077.

No habiendo terminado la conspiración cuando Batalla fué arrestado en Sabana Grande, la evidencia que el Tribunal declara inadmisible y que produce error motivando la revocación de las sentencias fué, a mi juicio, propiamente admitida, y en consecuencia la instrucción impugnada fué igualmente correcta. El caso de *Krulewitch* v. *United States*, supra, nada resuelve en contra de lo que he expuesto, pues allí la conspiración había terminado. Obviamente el Tribunal ha aplicado principios de derecho y precedentes jurispruden-

ciales fundamentalmente correctos si se tratara de actos ocurridos después de terminada una conspiración, a una situación de hechos y de derecho distinta de la que informan las autoridades citadas en la opinión.

Sin examinar los demás señalamientos de error del apelante, consigno mi disenso con relación al motivo preciso que conduce a la revocación.