EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CÁNDIDA BONILLA GONZÁLEZ y RAFAEL RIVERA GONZÁLEZ, acusados y apelantes.

Número 15804.

*Sometido:* 1 de marzo de 1955. *Resuelto:* 31 de marzo de 1955.

*William Morales Torres* y *Práxedes Álvarez Leandri,* abogados, respectivamente, de los apelantes; *Hon. Secretario de Justicia José Trías Monge* y *Rafael L. Ydrach Yordán, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

Cándida Bonilla González, Rafael Rivera González y Santos Hernández Aponte fueron acusados ante el Tribunal Superior de poseer criminalmente material de bolita, en violación de la Ley núm. 220, Leyes de Puerto Rico, 1948 ((1) pág. 739). Al terminar la prueba del Pueblo los acusados presentaron una moción de absolución perentoria. Se declaró con lugar la moción en cuanto a Hernández pero la corte la denegó en cuanto a Cándida Bonilla y a Rivera. Al finalizar el caso, el tribunal sentenciador declaró a los dos últimos culpables y sentenció a cada uno a seis meses de cárcel.

Tanto doña Cándida como Rivera—en alegatos por separado, representados por distintos abogados—arguyen que el tribunal sentenciador cometió error al declarar sin lu-

gar la moción para que se anulara la orden de allanamiento aquí envuelta y se suprimiera la evidencia obtenida en virtud de ella. Rivera no puede presentar esta contención en apelación por dos motivos. En primer lugar, la misma es tardía, ya que él nunca levantó la cuestión ni por moción antes del juicio ni en el juicio mismo; en verdad, durante el juicio su abogado afirmativamente manifestó que no tenía objeción a la presentación de la evidencia obtenida como resultado del allanamiento. Tal contención no se puede interponer por primera vez en apelación. *Pueblo* v. *Nieves,* 67 D.P.R. 305. En segundo lugar, la prueba demuestra no sólo que la residencia allanada estaba ocupada por doña Cándida sino que Rivera alegó que no era el dueño de los objetos ocupados. Bajo estas circunstancias doña Cándida era la única persona que tenía capacidad para tacar la validez de la orden de allanamiento. *Pueblo* v. *Monzón,* 72 D.P.R. 72; Cornelius, *Search and Seizure,* segunda edición, sección 160, pág. 367; véase *Pueblo* v. *Bracetty,* 70 D.P.R. 665.

Pasemos a los argumentos de doña Cándida con respecto a la orden de allanamiento, que fué expedida a base de una declaración jurada del policía Aladino Torres y que dice en parte como sigue:

"Que conozco personalmente a Jane Doe (c/p doña Candita, que reside en la calle Mayor núm. 219 de Ponce, P. R. y su residencia se describe como sigue: Casa de madera, techada de zinc, con piso de concreto, pintada al frente de color verde con fondo amarillo, sin balcón, terrera. Esta casa está dividida en apartamientos, las tres primeras puertas hay tienda de mercancía seca, las dos puertas que le siguen, residencia de la querellada y las otras dos puertas barbería propiedad de Juan Ortiz. Colinda por el lado sur con casa de negocio de verduras propiedad de Julián Paricci, por el norte con casa residencia de Enrique Bon, al oeste con casa residencia de José Paricci y por el lado este con la calle Mayor de Ponce, P. R.

"Que me consta de propio conocimiento, que la querellada Jane Doe c/p doña Candita, que reside en la casa antes descrita, manipula bancas de lotería clandestinas, generalmente conocidas por bancas de bolita o boli-pool, porque mientras el declarante

se encontraba dando una recorrida por dicha calle el día 25 de agosto de 1953 como a eso de las 5:30 P.M., pasé frente la casa residencia de la querellada y ví en ésta mientras manipulaba con boletos de bolita o boli-pool en diferentes colores y mientras hablaba con una señora mulata que allí se encontraba, hacía anotaciones en un papel blanco. No pude ocupar dicho material de bolita o boli-pool, por no estar provisto en ese momento de una orden de allanamiento, ya que dichas señoras al notar mi presencia corrieron y se encerraron en la residencia de referencia." [1]

La orden de allanamiento expedida a base de la anterior declaración jurada lée en parte como sigue:

"Habiéndose en este día presentado prueba por medio de declaración jurada firmada por Aladino Torres, Policía núm. 175 de *que Jane Doe c/p doña Candita en una casa que radica en la calle Mayor núm. 219, Ponce, P. R.,* . . . . la que se describe a continuación Casa de madera, techada de zinc, con piso de concreto, pintada al frente color verde con fondo amarillo sin balcón, terrera. Tiene al este siete puertas, al sur dos ventanas, al norte dos ventanas y al oeste dos puertas. *Esta casa está dividida en tres apartamientos las tres primeras puertas hay tienda de mercancía seca, las dos puertas que le siguen residencia de la querellada y las otras dos puertas barbería propiedad de Juan Ortiz.* Colinda por el lado sur con casa de negocio de verduras propiedad de Julián Paricci, por el norte con casa residencia de Enrique Bon, al oeste con casa residencia de José Paricci y por el lado este con la calle Mayor de Ponce, P. R. casa que es ocupada por el querellado Jane Doe c/p doña Candita en dicho sitio el querellado mencionado [aquí se describen sus actividades en re-

[1] En cuanto al derecho de un policía a llevar a cabo un arresto en el mismo acto sin una orden de arresto o una orden de allanamiento bajo tales circunstancias, *cf. Griffin* v. *State*, 92 A.2d 743 (Md., 1952) ; *certiorari* denegado, 345 U. S. 907. Si presumimos que bajo tales circunstancias—sin una orden de arresto o una orden de allanamiento—un policía puede entrar a la casa, arrestar a la persona envuelta, y ocupar los objetos que él vió que ella manipulaba, tal acción inmediata destruiría la contención que a veces se hace en las cortes de que un policía no podía físicamente reconocer y en efecto no reconoció como material de bolita, los objetos que a través de una ventana él vió que el acusado tenía en las manos y, por lo tanto, que el único propósito de su declaración jurada fué justificar el libramiento de una orden de allanamiento basada en mera sospecha y que autorizara el llevar a cabo a su conveniencia un allanamiento del lugar en busca de artículos ocultos. *Cf.*, en general, *Pueblo* v. *Santos*, 71 D.P.R. 310; *Pueblo* v. *Ríos*, 71 D.P.R. 969; *Pueblo* v. *Yulfo*, 71 D.P.R. 820; *Pueblo* v. *Soto*, 71 D.P.R. 830.

lación con la bolita] ; y hallando esta Corte que hay causa probable de que Jane Doe c/p doña Candita en el sitio y en la forma antes dichos, está utilizando el material y enseres arriba mencionados, a sabiendas e intencionalmente, en violación de la Ley Núm. 220 del 15 de mayo de 1948...

"Se le ordena por tanto que durante las horas del día y de la noche, proceda inmediatamente al registro de la *casa de Jane Doe c/p doña Candita, antes descrita,* en busca de las prendas siguientes..." (Bastardillas nuestras.)

Una orden de allanamiento es nula si la misma decreta el allanamiento de un lugar o de lugares que no se mencionan en la declaración jurada que dió origen a la misma. También, una orden de allanamiento, para ser válida, debe describir el lugar o los lugares a ser allanados con suficiente certeza de suerte que nada quede a la discreción del funcionario que la diligencia con respecto a qué lugar o qué lugares se le ordena que allane. Artículo II, sección 10, Constitución, Estado Libre Asociado de Puerto Rico; sec. 503, Código de Enjuiciamiento Criminal, ed. 1935; *Pueblo* v. *Burgos,* 73 D.P.R. 201; *Annotation,* 31 A.L.R.2d 864; *Fleming* v. *State,* 92 A.2d 747 (Md., 1952) ; casos coleccionados en 79 C.J.S. sec. 75, págs. 876–7 y 47 Am. Jur. sec. 35, págs. 522–3; *People* v. *Lienartowicz,* 196 N.W. 326 (Mich. 1923) ; Cornelius, supra, págs. 495, 508.

La orden de allanamiento en este caso no infringe ninguno de estos dos requisitos. Nada encontramos en la misma que autorice un allanamiento de otro lugar que no fuera la residencia de doña Cándida, el sitio donde se desarrollaron las actividades en que la orden se basó. Es cierto que la "casa" consistía de tres "apartamientos", uno de los cuales era la residencia de doña Cándida. Pero cuando el juez autorizó el allanamiento de "la casa de Jane Doe c/p doña Candita, antes descrita...", ordenaba obviamente que el allanamiento se limitase a aquella parte del edificio descrito en detalle tanto en la declaración jurada como en la orden de allanamiento, como la parte específica de la casa en que residía doña Cándida. De igual forma, la orden de allanamiento era suficien-

temente específica en el mandato con respecto al sitio a ser allanado: la residencia de doña Cándida. Además, toda vez que su residencia se describe tanto en la declaración jurada como en la orden de allanamiento como las dos puertas del medio de una hilera de siete puertas, la puerta del medio necesariamente conduce a su residencia. La declaración jurada y la orden de allanamiento no eran en consecuencia defectuosas porque no indicaran la dirección desde donde se contarían las puertas. (²)

■ Tanto Rivera como doña Cándida alegan que los autos no contienen evidencia suficiente para sostener sus respectivas sentencias.

El policía José Amadeo fué el único testigo del Pueblo. Declaró que cuando él y otros dos oficiales de la policía llegaron a la casa a cumplimentar la orden de allanamiento, Rivera y Hernández estaban en la tienda propiedad de doña Cándida. En dicho momento doña Cándida no estaba. Cuando Rivera y Hernández vieron que venían los policías, entraron rápidamente a la residencia por una puerta en común. Los policías "se fueron detrás de ellos". El testigo preguntó por Cándida. Rafael Rivera contestó, "Yo soy el que estoy encargado en lo que ella llega del pueblo." Los policías entregaron la orden de allanamiento a Rivera por ser éste el encargado. Cuando registraron la cama en la habitación, levantaron la colchoneta por la parte donde está la almohada y encontraron debajo 142 boletos de bolita envueltos en papel de estraza de la banca conocida por "El Sol". Luego

---

(²) De los autos no aparece enteramente claro si los policías que efectuaron el allanamiento entraron directamente en la residencia de doña Cándida o fueron primeramente a su tienda y luego a su residencia. No obstante, aun suponiendo que los policías entraron en la residencia a través de la tienda, penetraron legalmente en esta última por estar abierta al público. Una vez dentro de la tienda, tenían derecho a penetrar en la residencia a través de la puerta por donde se pasa del establecimiento a la residencia, por cuanto tenían una orden válida para allanar esta última. *Pueblo v. López*, 77 D.P.R. 529. La situación podría ser distinta si se hubiera allanado la tienda. Véase *Pueblo v. Barrios*, 72 D.P.R. 171. Pero únicamente se llanó la residencia de doña Cándida, según se autorizó en la orden.

estos objetos fueron admitidos en evidencia. La policía registró a Rivera y a Hernández pero nada les encontró que les incriminara. Cuando regresó Cándida negó que el material de bolita fuese suyo, y dijo "que sería" de alguno de los otros dos acusados.

Rivera declaró en su defensa que como a la 1:30 de la tarde del día en cuestión doña Cándida le pidió que se quedara "allí" en lo que iba al pueblo a una diligencia. Media hora después llegó la policía. Ésta encontró el material de bolita debajo de la colchoneta de la cama de doña Cándida.

El acusado Rivera trajo a Monserrate Guzmán a declarar. Declaró que vió a los policías entrar a la tienda y pasar por ésta a la habitación donde registraron a Rivera y a Hernández. Los policías salieron de la habitación con los objetos de bolita.

Doña Cándida ofreció el testimonio de Aladino Torres, el policía que suscribió la declaración jurada y participó en el diligenciamiento de la orden de allanamiento. El testigo declaró que cuando los otros policías y él llegaron, Rivera y Hernández estaban en la puerta de entrada de la casa. Cuando vieron a la policía, Rivera y Hernández entraron precipitadamente a la habitación. La policía entró y el testigo entregó la orden de allanamiento a Rivera. Éste ". . . estaba moviendo unas piezas de una de las camas. Al darle la orden yo le pregunté que por qué movía eso allí y levantamos una almohada al lado de donde estaba él moviendo y allí había ciento cuarenta y dos quintos de bolipul. . . Había un traje y una almohada, él cogía el traje y lo levantaba, y lo ponía encima de la almohada y allí estaban los ciento cuarenta y, dos quintos de bolita. . . . Le pregunté que por qué tenía que estar moviendo eso allí y dijo, porque yo soy el encargado de la casa ahora. . . porque doña Cándida estaba ausente." Después de haber la policía encontrado el material de bolita, Rivera le dijo que doña Cándida ". . . le había dado ese material de bolita para que se lo guardara."

El testimonio que hemos sintetizado—junto con el material de bolita ocupado como resultado del allanamiento—fué suficiente para sostener las sentencias de doña Cándida y de Rivera. La conducta de este último al correr a la residencia cuando vió a la policía; sus movimientos arriba descritos cerca de la cama donde se escondió el material de bolita; y sus manifestaciones al efecto de que era el encargado de doña Cándida y que ella "...le había dado ese material de bolita para que se lo guardara", justifican su condena por el delito de poseer material de bolita. Rivera arguye que en vista de la condena de doña Cándida, él no podía también ser convicto del delito de poseer dicho material. Pero este delito no es exclusivo mutuamente, según Rivera parece creer. Por el contrario, bajo circunstancias adecuadas como en este caso no hay motivo por el cual dos o más personas no puedan ser convictas conjuntamente por la posesión del mismo material de bolita. *Cf. Pueblo* v. *Berenguer*, 59 D.P.R. 81; *Pueblo* v. *Castro*, 75 D.P.R. 672; *Pueblo* v. *Pieras*, 72 D.P.R. 779; y *Pueblo* v. *Almodóvar*, 71 D.P.R. 20, que más adelante discutimos en cuanto a otro punto.

En cuanto a doña Cándida, su condena por la posesión debe ser sostenida, en vista del hecho de que el material fué hallado en la habitación de su casa debajo de la colchoneta de su cama mientras Rivera estaba encargado de la casa en representación de ella y en vista de la manifestación de Rivera a la policía de que doña Cándida "...le había dado ese material de bolita para se lo guardara." [3] Véanse *Smith* v. *State*, 24 S.E.2d 702 (Ga., 1943); *Lewis* v. *State*, 14 S.E.2d 599 (Ga. 1941).

Al sostener que la evidencia no justifica sus sentencias, doña Cándida y Rivera descansan en nuestra manifestación en *Pueblo* v. *Almodóvar*, supra, 24, que dice así: "Es

---

[3] Esta admisión específica de Rivera complicando a Cándida Bonilla fué presentada en evidencia sin objeción del abogado de ésta. *Cf. Pueblo* v. *Castro*, supra.

regla firmemente establecida en casos criminales que para poder declarar culpable a un acusado a base únicamente de prueba circunstancial o de indicios, es necesario, no sólo que todas las circunstancias probadas concurran para dejar demostrado que él cometió el delito de que se le acusa, sino que ellas son inconsistentes con cualquiera otra conclusión razonable. Es decir, dicha prueba debe ser no sólo compatible con la culpabilidad del acusado, sino incompatible con cualquier otra hipótesis razonable de inocencia. *Pueblo* v. *Nevárez*, 10 D.P.R. 94, 102; *Pueblo* v. *Quintana*, 44 D.P.R. 40; *Pueblo* v. *Sánchez*, 55 D.P.R. 351; *Pueblo* v. *Arteaga*, 70 D.P.R. 668."

Sin embargo, la Corte Suprema recientemente rechazó esta doctrina en *Holland* v. *United States*, 348 U.S. 121, 139–40:

"...Los peticionarios atacan la negativa del juez sentenciador a instruir al jurado que cuando la evidencia del Pueblo es circunstancial, la misma debe ser tal que excluya cualquier hipótesis razonable que no sea la de culpabilidad. En las decisiones de los tribunales inferiores existe algún apoyo para esta clase de instrucción, *Garst* v. *United States*, 180 F. 339, 343; *Anderson* v. *United States*, 30 F. 2d 485–487; *Stutz* v. *United States*, 47 F.2d 1029, 1030; *Hanson* v. *United States*, 208 F.2d 914, 916, pero la mejor regla es que cuando el jurado está debidamente instruído sobre las normas para duda razonable, una instrucción adicional de esta naturaleza sobre evidencia circunstancial es confusa e incorrecta, *United States* v. *Austin-Bagley Corp.*, 31 F.2d 229, 234, cert. denegado, 279 U.S. 863; *United States* v. *Becker*, 62 Fd.2d 1007,1010; 1 Wigmore, *Evidence* (tercera edición), secciones 25–26.

"Evidencia circunstancial *a este respecto* es intrínsecamente igual que la evidencia directa o testifical. Se admite que la evidencia circunstancial puede en algunos casos conducir a un resultado enteramente incorrecto. Sin embargo esto es igualmente cierto de la evidencia testifical. En ambos casos, el jurado está llamado a pesar las ocasiones en que la evidencia correctamente indica culpabilidad frente a la posibilidad de una equivocación o una inferencia ambigua. En ambos casos, el jurado debe usar su experiencia con la gente y con los sucesos de la vida al apre-

ciar las probabilidades. Si el jurado queda convencido fuera de duda razonable, nada más podemos exigir." (Bastardillas nuestras.)

Si bien esto es una cuestión de ley local, creemos que la regla establecida por el caso de *Holland* es la mejor y la seguiremos. El caso de *Almodóvar* y los casos similares quedan por tanto expresamente revocados. Desde ahora, al apreciar la evidencia en un caso criminal—y al instruir al jurado sobre la cuestión—los jueces sentenciadores no deben usar la norma de que para poder justificar la convicción la evidencia circunstancial debe ser inconsistente con cualquier otra hipótesis razonable de inocencia. Por el contrario, según se dijo en el caso de *Holland*, el problema es si la evidencia—bien sea circunstancial o testifical—establece la culpabilidad del acusado fuera de duda razonable. Y, como ya se ha indicado, la evidencia en este caso se ajusta a esa norma en cuanto a doña Cándida y a Rivera.

■■ Los otros dos errores señalados por doña Cándida no requieren amplia consideración. Arguye que la corte sentenciadora cometió error (*a*) al declarar sin lugar su moción de absolución perentoria y (*b*) al permitirle al abogado de los otros acusados que contrainterrogara a Torres, testigo presentado por doña Cándida. En cuanto a (*a*), doña Cándida renunció a la moción de absolución perentoria cuando presentó prueba después de haberle el tribunal sentenciador declarado sin lugar la moción. *Pueblo* v. *Díaz*, 69 D.P.R. 621. En cuanto a (*b*), ésta es una contención frívola. Habiendo Torres, testigo de doña Cándida, declarado en forma que incriminaba al coacusado Rivera, el abogado de éste tenía derecho a contrainterrogar al testigo. *State* v. *Crooker*, 122 Atl. 865 (Me., 1923) ; *Pueblo* v. *Braune*, 2 N.E.2d 839 (Ill., 1936).

*La sentencia del Tribunal Superior será confirmada.*